**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Mario ESCANDAR, Defendant-Appellant.**

No. 71–1279

Summary Calendar.*

United States Court of Appeals,
Fifth Circuit.

Jan. 24, 1972.

---

* [1] Rule 18, 5 Cir.; See Isbell Enterprises, Inc. v. Citizens Casualty Co. of New York et al., 5 Cir., 1970, 431 F.2d 409.

Guillermo Sostchin, Donald I. Bierman, Miami, Fla., for defendant-appellant.

Robert W. Rust, U. S. Atty., George A. Kokus, Asst. U. S. Atty., Miami, Fla., for plaintiff-appellee.

Before JOHN R. BROWN, Chief Judge, and INGRAHAM and RONEY, Circuit Judges.

JOHN R. BROWN, Chief Judge:

In an unusual case which finds both sides relying on legal propositions normally argued by the opposition, Defendant urges that his conviction for escape from federal custody should be overturned because his direct testimony at trial was *too* inculpatory, while the Government, in support of affirmance, awkwardly contends that his statements were not incriminating enough to establish a prima facie case. Believing that Defendant's argument is but an idea whose time has not yet come—and probably never will—we affirm the judgment of the Trial Court.

Mario Escandar had been arrested and incarcerated pursuant to an indictment charging him with forty counts of violating or conspiring to violate Federal narcotics laws.[1] Bail was set at $500,000. Having unsuccessfully sought a reduction of bail,[2] and desiring to assist his attorney in the preparation of a defense for the upcoming trial, Escandar and a fellow-prisoner impatiently[3] re-

---

1. He was subsequently tried and convicted of violations of 26 U.S.C.A. §§ 4704(a) and 7237(a), and sentenced to thirteen years in the federal penitentiary.

2. Eventually bail was lowered to $350,000 and then to $250,000, but as a result of the acts which produced the present case, it was raised an additional $500,000.

3. The escape was originally planned to be a more traditional and less risky nighttime affair, but Defendant testified that he got tired of waiting and decided to re-

moved themselves from the Miami jail in the middle of a Saturday afternoon. As soon as possible, Escandar contacted his attorney and requested that the attorney negotiate a reduction in bail in exchange for Escandar's return to custody.

Handling this difficult situation in a manner admirably balancing the duty to one's client with the responsibilities of an officer of the Court,[4] the attorney persuaded Escandar to turn himself in. This was done—so cooperatively in fact that one of the arresting officers was Defendant's only other witness at the trial for escape.

Understandably in a case so uncomplicated and clear, the trial without a jury was brief and informal. The prosecutor put on two witnesses who testified that they had made a headcount at the jail at 10:15 p.m. on August 22 and discovered that Escandar and Restoy were

missing. Next one of the arresting officers told about Escandar's return to custody the next day. The Government rested.

The defense called the other arresting officer who testified that Defendant was cooperative and that, upon giving himself up, Escandar explained that his motive for the escape was to protest the high bail. Finally, the Defendant took the stand. After preliminary swearing-in and identification, the testimony elicited by questions from Defense Counsel made out a case more iron shut than the Miami jail.[5]

Thereafter, Escandar was pronounced guilty and sentenced to three years in the federal penitentiary for his short-lived escapade.

The only issue raised on appeal is Defendant's claim that his testimony was so indistinguishable from a plea of guilty, that Rule 11 [6] warnings and in-

cuse himself from the jail about 3:00 o'clock Saturday afternoon. The escape was markedly undramatic and discomfortingly simple requiring only a bent spoon to unlatch one door and a minor two-story leap to freedom. The absences went unnoticed until about 10:15 that night.

4. In discussions with his client, the attorney made very clear that Defendant's demand for reduction of bail was strictly nonnegotiable and that he was only damaging his case as well as that of his co-conspirators by remaining at large.

5. Q. It is true that you were held as a federal prisoner in the Miami City Jail on Saturday, the 22nd of August 1970?
A. Yes.
Q. On that date did you and Juan Restoy leave there without getting permission?
A. Yes.
Q. Will you explain to the Court why you left the City Jail? In your own words just tell the Judge about it.

At this point, Escandar launched into a 22-page monologue setting forth all details of the escape (including some of which the Government was apparently even then unaware) and explaining the motive. He complained that (i) his bail had been set excessively high because of

four inaccurate Government allegations, (ii) he was greatly concerned about his defense in the upcoming trial and wanted to talk to his attorney about it, and (iii) he needed medical attention for a bleeding ulcer, which could not be properly treated at the jail.

6. F.R.Cr.P. 11, which, in pertinent part provides:
"A defendant may plead not guilty, guilty or, with the consent of the court, *nolo contendere*. The court may refuse to accept a plea of guilty, and shall not accept such plea or a plea of *nolo contendere* without first addressing the defendant personally and determining that the plea is made voluntarily with understanding of the nature of the charge and the consequences of the plea. If a defendant refuses to plead or if the court refuses to accept a plea of guilty or if a defendant corporation fails to appear, the court shall enter a plea of not guilty. The court shall not enter a judgment upon a plea of guilty unless it is satisfied that there is a factual basis for the plea."
Admittedly, earlier decisions regarding the effect of Rule 11 turned on the supervisory powers of appellate courts, rather than constitutional imperatives. See e. g., McCarthy v. United States, 1969, 394 U.S. 459, 89 S.Ct. 1166, 22 L.Ed.2d 418. Subsequent decisions, however, extending Rule 11 principles to State court,

quiries became mandatory. The issue, straight-forward as it is, suggests some profound Constitutional questions which must be considered in a resolution of the case.

Our analysis of the viability of the defense claim must begin with an understanding of the Constitutional principles underlying the decisions regarding the acceptability of guilty pleas. The basis of these holdings is essentially this: A guilty plea constitutes a waiver of at least three fundamentally important Constitutional rights—(i) the privilege against compulsory self-incrimination, (ii) the right to a full-dress trial (with a jury if Defendant so chooses) and (iii) the right to confront accusers. Constitutional rights can be waived but the accused must have actual knowledge of their existence, full understanding of their meaning and clear comprehension of the consequence of their waiver. Johnson v. Zerbst, 1937, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461; Dupes v. Johnson, 6 Cir., 1965, 353 F.2d 103. As Miranda v. Arizona, 1966, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 illustrates, the presumption against waiver of a Constitutional right is strong. For waiver, the record must reflect a basis for the conclusion of the requisite knowledge and explanation. Boykin v. Alabama, 1969, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274. Therefore, before a plea of guilty can be accepted, the Trial Judge must personally address the Defendant, question him explicitly, explain the Constitutional rights involved and satisfy himself that the accused has "a full understanding of what his plea of guilty connotes and of its consequences." *Id.* 89 S.Ct. at 1712, 23 L.Ed. 2d at 280.

Applying that rationale to the case at bar, we must conclude that the considerations are not the same. In the first place, two of the Constitutional principles are not even at issue in the case of in-court testimony. There was no waiver of the right to confront witnesses, since cross-examination had been allowed and employed at every stage up to the Defendant's testimonial appearance. Likewise, the Government had previously fulfilled its Due Process obligation of establishing a prima facie case [7]—and would have carried this burden before a jury if the Defendant had so requested. Thus, these two elements are out of the case and we are left only to consider the self-incrimination aspects of the Defendant's testimony.

The Fifth Amendment protects the individual from being *"compelled* in any criminal case to be a witness against himself." (Emphasis added.)

may have established that Rule 11-type procedures are constitutionally mandated, at least in guilty plea situations. See, Boykin v. Alabama, 1969, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274. But the expansion of Rule 11's applicability has not advanced unchecked. See, Halliday v. United States, 1969, 394 U.S. 831, 89 S.Ct. 1498, 23 L.Ed.2d 16; and Dominquez v. Henderson, 5 Cir., 1971, 447 F.2d 207 [July 13, 1971] (holding *McCarthy* and *Boykin,* respectively, not to be given retroactive effect).

7. Admittedly, at the point the Government rested, the proof was skeletal to be sure. About all that had been shown was the Defendant was not present at headcount and that he was subsequently—cooperatively—returned to custody. No verbal testimony had been offered by the Government on intent, even though the indictment charged "wilful and knowing" escape. For example, the Government did not even suggest a single *act* of Defendant, such as his manner of escape, or his plan or statements to other cellmates or to the arresting officers, from which intent could unquestionably be inferred.

But whatever weaknesses there were in the Government's case had Defendant taken the awesome position of standing on a motion for a judgment of acquittal—which was not even made—in this Circuit the sufficiency of the evidence is measured by the total record, no matter who presents the testimony. And when the Defendant took the stand, he supplied the missing elements, explained the method and purpose of the escape, admitted—all under *direct* examination—that he knew he did not have permission to leave the jail, and related every detail of the case.

■■ To be compelled is to be *subjected* to some coercion, fear, terror, inducement, trickery or threat—either physically or psychologically, blatantly or subtly. The hallmark of compulsion is the presence of some operative force producing an involuntary response. Compulsion is not present where the act proceeds from the exercise of choice or free will, self-impelled and freely undertaken, and unconstrained by interference. And, of course, the response must be free from improper influences (e.g., fear, ignorance, trickery, etc.) such as would render it less than the exercise of unfettered free will.

When a Defendant, effectively represented by competent counsel, takes the stand to testify, he does so invariably as his own proffer of evidence. The act is voluntary, it is not solicited by the other side. And that fact distinguishes in-court testimony from custodial investigation and guilty plea situations.

In the *Miranda* situation, a custodial environment, considered by the law to be psychologically coercive, particularly where the interrogation is accusatorial in nature, subjects the person to "inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." *Miranda, supra*, 86 S.Ct. at 1624, 16 L. Ed.2d at 719. Absent evidence in the record that the Defendant was fully cognizant of his Fifth Amendment rights, it is impossible to say with requisite assurance that the response to police questions was freely and voluntarily given.

In the guilty plea setting—with all of the awesome consequences attaching to that action—to assure that the response is not the involuntary product of "ignorance, incomprehension, coercion, terror, inducements, subtle or blatant threats" —which may be a "perfect cover-up of unconstitutionality" [8]—the Judge must address the Defendant personally, advise him of his rights, outline the consequences of the plea and assure himself of the voluntariness of the reply.

In-court testimonies differ, however. No one has requested that Defendant say or do anything. Operationally, the testimony is a voluntary, self-impelled act undertaken by the Defendant without any prodding or cajoling by the Government which might even conceivably produce a compelled response. There is no basis for fearing the act may be the result of compulsion, and therefore no Constitutional requirement that Rule 11-type warnings and inquiries be made.

■ In fact, reliance on the Fifth Amendment in the case at bar is not really done on the basis that the Defendant was *compelled* to speak. It is rather asserted that the consequences of express admissions so contrary to self-interest are so like a guilty plea that the Defendant must be protected in similar fashion. Of course, it is the better practice for the prudent Trial Judge to address the Defendant before he takes the stand and explain that he cannot be compelled to testify. But there is no indication here that Defendant was ignorant of that privilege or, more importantly, that he is complaining about the failure of the Judge to give him that advice before he took the stand. What he is complaining of is that the Judge did not satisfy himself as to each aspect covered by Federal Rule of Criminal Procedure 11.

■ Not the least of the reasons why the two situations (guilty pleas and custodial interrogation) are not comparable is the position which the Judge is put in by any such mandatory rule. Since he ordinarily would not be privy to what is in the Defendant's mind, or what his story will be or what he is going to testify to, it would be presumptuous for the Judge to interrogate the Defendant at the outset of his testimony along the lines of Rule 11. If not at the beginning, then what? Should it be at the moment he makes what appears to an outsider—the impartial umpire—to be a

---

8. Boykin v. Alabama, *supra*, 89 S.Ct. at 1712, 23 L.Ed.2d at 279.

harmful statement? How can the Judge determine what the strategic or tactical purpose is, or how effective it may be? In escapable doubt, should he let it go on a little longer? And if so, when does he step in and how does he undo the self-inflicted harm? Indeed, what can the Judge then do which is not mere formalism? This all adds up to the conclusion that by pursuing a Rule 11 interrogation during trial, the Judge gets dangerously near the role of an advocate, so the only safe route is to confine his intercession to advising the accused that he does not have to testify. Since that is not the issue here asserted, the broad claim for a Rule 11 equivalent fails.[9]

Affirmed.

9. To the extent that Julian v. United States, 6 Cir., 1956, 236 F.2d 155 and United States v. Brown, 1970, 138 U.S. App.D.C. 398, 428 F.2d 1100 (dealing with decisive stipulations) indicate a different result, we do not adopt them for this Circuit.