Timothy Mark McKINNON, Appellant,

v.

STATE of Alaska, Appellee.

Nos. 2227, 2228.

Supreme Court of Alaska.

Aug. 30, 1974.

44. *Id.* at 435 [footnotes omitted].

Phillip P. Weidner, Asst. Public Defender, Herbert D. Soll, Public Defender, Anchorage, for appellant.

Stephen G. Dunning, Asst. Dist. Atty., Joseph D. Balfe, Dist. Atty., Anchorage, Norman Gorsuch, Atty. Gen., Juneau, for appellee.

Robert H. Wagstaff, Wagstaff, Rubinstein & Middleton, Anchorage, for the American Civil Liberties Union as amicus curiae, on behalf of appellant.

## OPINION

Before RABINOWITZ, C. J., and CONNOR, ERWIN and BOOCHEVER, JJ.

BOOCHEVER, Justice.

McKinnon appeals from his conviction for sale of narcotics, AS 17.10.010. He specifies a multitude of errors on appeal, four of which bear discussion.

On the night of September 10, 1973, Richard Howe, an Anchorage police officer acting as an undercover narcotics detective arranged with McKinnon's co-defendant, Kenneth Knight, to purchase an ounce of cocaine the following day. When Officer Howe met with Knight the next afternoon in front of Chilkoot Charlie's Bar in Anchorage, McKinnon was also present. Howe testified that the three of them went to an apartment nearby, where the sale was consummated.

McKinnon was later arrested and indicted. The case was assigned to Judge Occhipinti. Since McKinnon was on parole at the time of his arrest, a probation revocation hearing was scheduled before Judge Moody, but was deferred pending the outcome of the criminal prosecution. Both Judge Moody and Judge Occhipinti were peremptorily challenged, at which time Judge Occhipinti, acting as presiding judge, reassigned the probation revocation hearing to himself, and transferred the criminal prosecution to Judge Moody.

In early December 1973, the Public Defender Agency learned that one of its clients, Bernard Lono, was an informer for the police. The state does not dispute that Lono was an informer. Mr. Weidner, the Assistant Public Defender assigned to represent McKinnon, initiated an investigation in order to determine whether Lono had

overheard communications between himself and McKinnon, or whether Lono had inspected the McKinnon file. However, Mr. Weidner was unable to locate Lono because he had been sequestered by the police.

On Friday afternoon, January 4, 1974, Mr. Weidner, according to his account, became aware of certain unspecified facts which led him to believe that Lono had in fact become privy to confidential information pertaining to McKinnon's case.[1] On Wednesday, January 9—the day of trial—Mr. Weidner moved for an evidentiary hearing to determine whether Lono had unconstitutionally invaded the attorney-client relationship between McKinnon and himself. The District Attorney opposed the motion, charging that the Public Defender Agency had known the material facts upon which the motion was based as long as a month before trial. The trial judge accepted the District Attorney's unsubstantiated version of the facts. Regarding the situation as merely another instance of the inexcusable lack of preparation which he felt pervaded the Public Defender Agency, the trial judge then removed Mr. Weidner as McKinnon's counsel, over the defendant's explicit protest. Another lawyer, Mr. Clouse, was immediately appointed.

McKinnon's trial finally commenced on March 4, after the newly-appointed attorney had been given time to familiarize himself with the case. On March 6, McKinnon entered a plea of nolo contendere. The defendant's motion to withdraw this plea was denied on April 5. McKinnon's parole was revoked on April 25.

I

We think it clear beyond argument that first by dismissing Mr. Weidner as McKinnon's attorney, and then by appointing unwanted counsel to represent McKinnon over McKinnon's express protest, the trial court deprived the defendant of his fundamental right under the sixth amendment to the United States Constitution and art. I, § 11 of the Alaska Constitution[2] to counsel of his choice.

The United States Supreme Court has on numerous occasions re-affirmed the principle that a criminal defendant's choice of counsel must be honored.[3] And the lower Federal courts have repeatedly held that the removal of retained counsel and the appointment of unwanted counsel over a defendant's objection constitutes a violation of the sixth amendment right to counsel. For example, in Releford v. United States[4] the defendant's retained attorney, Wendell Kay, became ill, and the trial judge appointed an attorney with whom Mr. Kay shared office space to represent Releford—despite Releford's insistence on representation by Mr. Kay, or, in the alternative, by an attorney other than the one appointed. The United States Court of Appeals for the Ninth Circuit reversed the conviction, holding that, "contrary to the Sixth Amendment, appellant was deprived of the assistance of counsel of his own choice".[5] The courts of appeals for the

---

1. The record is ambiguous on this point. During oral argument Mr. Weidner did not renew his assertion that on January 4 he came upon particular items of information indicating to him that attorney-client confidentiality may have been breached. Instead, Mr. Weidner explained that after continuous investigation, he was able to conclude on January 4 that there was a reasonable possibility Lono had invaded the attorney-client relationship.

2. The sixth amendment of the United States Constitution provides in part: "In all criminal prosecutions, the accused shall . . .

have the assistance of counsel for his defense." Art. I, § 11 of the Alaska Constitution similarly provides for the right to the assistance of counsel.

3. See Powell v. Alabama, 287 U.S. 45, 53, 53 S.Ct. 55, 58, 77 L.Ed. 158, 162 (1932); accord, Reynolds v. Cochran, 365 U.S. 525, 81 S.Ct. 723, 5 L.Ed.2d 754 (1961); Chandler v. Fretag, 348 U.S. 3, 75 S.Ct. 1, 99 L.Ed. 4 (1954).

4. 288 F.2d 298 (9th Cir. 1961).

5. Id. at 302.

Seventh Circuit[6] and the District of Columbia[7] have also concluded that the removal of a retained attorney and the imposition of unwelcome counsel upon an unwilling defendant represents an unwarranted intrusion upon basic sixth amendment rights.[8] In fact, we need not look beyond our own decisions. In Klockenbrink v. State,[9] we wrote:

> [T]he accused cannot be forced to be heard at trial through counsel other than the one employed by him or appointed by the court, as the case may be, to represent him, no matter how competent, experienced and conversant with the case other counsel may be and regardless of the fact that in retrospect the other counsel afforded him a genuine and effective representation.[10]

We recognized that these decisions concerned the dismissal of privately retained counsel and that an indigent defendant is not entitled to representation by any particular attorney. But as we stated in *Klockenbrink*:

> [T]here is no valid distinction between appointed counsel and privately employed counsel in determining the adequacy of representation of an accused . . . [o]nce counsel has been chosen, whether by the court or the accused, the accused is entitled to the assistance of *that* counsel at trial.[11]

We find ourselves in complete agreement with the California Supreme Court's observation that:

[O]nce counsel is appointed to represent an indigent defendant, whether it be the public defender or a volunteer private attorney, the parties enter into an attorney-client relationship which is no less inviolable than if counsel had been retained. To hold otherwise would be to subject that relationship to an unwarranted and invidious discrimination arising merely from the proverty of the accused.[12]

Preservation of the right to proceed with one's chosen counsel is not mere constitutional formalism. The attorney-client relationship involves "an intimate process of consultation and planning which culminates in a state of trust and confidence between the client and his attorney."[13] Often, the outcome of a criminal trial may hinge upon the extent to which the defendant is able to communicate to his attorney the most intimate and embarrassing details of his personal life. Complete candor in attorney-client consultations may disclose defenses or mitigating circumstances that defense counsel would not otherwise have uncovered. At the very least, an open exchange between attorney and client will often foreclose the possibility of surprise at trial.

Once counsel has been appointed, and the defendant has reposed his trust and confidence in the attorney assigned to represent him, the trial judge may not, consistent with the United States and Alaska constitutions, rend that relationship by dismissing the originally appointed attor-

---

6. *See* United States v. Seale, 461 F.2d 345, 360 (7th Cir. 1972).

7. Lee v. United States, 98 U.S.App.D.C. 272, 235 F.2d 219, 221 (1956).

8. *See also* United States v. Mitchell, 354 F. 2d 767, 769 (2nd Cir. 1966); Davis v. State, 292 Ala. 210, 291 So.2d 346, 350 (1974); People v. Crovedi, 65 Cal.2d 199, 53 Cal. Rptr. 284, 417 P.2d 868 (1966); People v. Iacona, 44 Misc.2d 576, 254 N.Y.S.2d 359, 360 (1964), finding the denial of a continuance sought in order to permit chosen counsel to appear to be unconstitutional under the circumstances presented.

9. 472 P.2d 958 (Alaska 1970).

10. *Id.* at 966, *quoting from* English v. State, 84 Md.App. 330, 259 A.2d 822, 826 (1969) (footnote omitted).

11. Klockenbrink v. State, 472 P.2d at 965–966, *quoting from* English v. State, 259 A.2d at 826 (emphasis in original).

12. Smith v. Superior Court of Los Angeles County, 68 Cal.2d 547, 562, 68 Cal.Rptr. 1, 10, 440 P.2d 65, 74 (1968) (footnote omitted).

13. *Id. See also* Lee v. United States, 235 F. 2d at 221 n. 5.

ney and then thrusting unfamiliar and unwelcome counsel upon the defendant. The attorney-client relationship, once established, is inviolate, and may not be severed or otherwise intruded upon.[14]

We further note that the dismissal of counsel by the trial court after preparation of the defendant's case has already begun will frequently render the assistance of subsequently appointed counsel constitutionally defective. The defendant, wrongfully deprived of the attorney in whom he had confided, may find himself unable to cooperate fully with the lawyer forced upon him against his will, resulting in inadequate trial preparation by that attorney. The record in this case amply demonstrates that risk.

We are also aware that the threat of summary dismissal for provoking the trial judge's displeasure could intimidate the trial bar and discourage tenacious trial representation.[15] Such a grave dilution of the constitutional right to counsel cannot be tolerated. As the California Supreme Court stated, in ordering the reinstatement of an attorney who had been removed for "incompetence" after repeatedly infuriating the trial judge with his abrasive courtroom manner:

> The outright removal of counsel on the ground of his alleged "incompetency," however, is even more of a threat to the independence of the bar than is arbitrary misuse of the contempt power. As Mr. Kanarek, writing for defendant Smith, persuasively argues; "if the advocate must labor under the threat that, at any moment, if his argument or advocacy should incur the displeasure or lack of immediate comprehension by the trial judge, he may be summarily relieved as counsel on a subjective charge of incompetency by the very trial judge he is attempting to convince, his advocacy must of necessity be most guarded and lose much of its force and effect." The inhibition imposed on a defense attorney by such a threat constitutes a serious and unwarranted impairment of his client's right to counsel.[16]

■ We need not, and therefore do not, decide whether Mr. Weidner's motion for an evidentiary hearing was the product of inadequate trial preparation which unjustifiably delayed trial. It suffices to say that even if the motion could be so characterized, the trial court did not have the authority to deprive the defendant of the services of his appointed trial attorney. We are not unsympathetic to the trial judge's exasperation at alleged repeated failures of a public agency to be timely prepared for trial. The state's crucial interest in the prompt and orderly disposition of criminal cases, however, can be vindicated by other, equally effective sanctions which are not so subversive of basic constitutional rights. The court may censure the obstructive attorney, or request the bar association to take disciplinary action. Or the court may assess a fine or impose a term of imprisonment under its contempt power.[17]

---

14. *See* Smith v. Superior Court of Los Angeles County, 68 Cal.Rptr. at 11, 440 P.2d at 75; *cf.* Fajeriak v. State, 520 P.2d 795, 799–800 (Alaska 1974).

15. *Cf.* McCracken v. State, 518 P.2d 85, 91 (Alaska 1974).

16. Smith v. Superior Court of Los Angeles County, 68 Cal.Rptr. at 10, 440 P.2d at 73–74. *See also* In re McConnell, 370 U.S. 230, 236, 82 S.Ct. 1288, 1292, 8 L.Ed.2d 434, 438–439 (1962):

> While we appreciate the necessity for a judge to have the power to protect himself from actual obstruction in the courtroom or even from conduct so near to the court as actually to obstruct justice, it is also essential to a fair administration of justice that lawyers be able to make honest good-faith efforts to present their clients' cases. An independent judiciary and a vigorous, independent bar are both indispensable parts of our system of justice.

And *see* In re Hallinan, 71 Cal.2d 1179, 1184, 81 Cal.Rptr. 1, 5, 459 P.2d 255, 259 (1969).

17. However, we urge great restraint in the imposition of these sanctions, lest forceful advocacy be unnecessarily curtailed. *See* note 16, *supra*, and accompanying text.

All of these methods of dealing with dilatory conduct are, we think, likely to prove substantially more efficacious than the summary removal of counsel, which, in the final analysis, only penalizes the defendant. We also cannot understand the logic of relieving counsel on the eve of trial for unnecessarily delaying the proceedings, when the appointment of another attorney necessarily results in a still more protracted trial postponement while newly appointed counsel acquaints himself with the case.[18]

The trial court's decision to replace Mr. Weidner was also an abuse of discretion. In dismissing Mr. Weidner as McKinnon's counsel of record, the trial court alluded to the Public Defender Agency's chronic inability to proceed on the date of scheduled court appearances, due to inadequate preparation.[19] Underlying this reference is an implicit premise that the Public Defender Agency is a unitary entity, and that attorneys of the Public Defender Agency may be held accountable for the transgressions, real and imagined, committed by every past and present member of the staff. Such a postulate need only be identified to be discredited. We doubt the trial judge would have held a private attorney responsible for the sins committed in unrelated actions by other partners of his firm; the Public Defender Agency may not be treated less favorably. There is no indication of any prior accusation of dilatory tactics having been levelled against Mr. Weidner.

The state argues that even if McKinnon was unconstitutionally deprived of the services of his chosen counsel, his entry of a plea of nolo contendere insulates his conviction from attack upon appeal. It is of course settled that a plea of nolo contendere will ordinarily foreclose appellate review of any but jurisdictional defects.[20] But it is equally well-established that a conviction based on a plea [21] made without the benefit of counsel may subsequently be challenged.[22] Similarly, a plea of guilty does not foreclose a later attack upon a conviction on the ground that the plea was entered with the ineffective assistance of counsel.[23] We hold that where a defendant has been denied the right to be represented by his chosen counsel, the subsequent entry of a plea of guilty or nolo contendere does not shield a conviction from challenge on appeal, since the voluntariness and reliability of such a plea is inherently suspect, just as it is when a plea is entered without counsel, or with the ineffective assistance of counsel.

McKinnon's conviction must therefore be reversed. Since the probation revocation was expressly based upon the conviction, it too must be vacated. We express no view as to the merits of the mo-

---

18. McKinnon's trial was calendared for January 9. Due to the change of attorneys, trial did not in fact commence until March 4.

19. At a February 15 pre-trial hearing, the trial judge amplified upon his rationale for dismissing Mr. Weidner:

 [T]he court didn't take this action against Mr. Weidner because he's Mr. Weidner or because he's the public defender, but because there's been a course of conduct on the part of the public defender's agency and the attorneys in that agency over a period of months, if not years, to not being prepared—not only for trial of cases, but in omnibus hearings and hearings on motions . . . . .

20. United States v. Sepe, 474 F.2d 784, 787 (5th Cir. 1973), aff'd en banc per cur. 486 F.2d 1044 (5th Cir. 1973); United States v. Cosentino, 191 F.2d 574, 575 (7th Cir. 1951); Cooksey v. State, 524 P.2d 1251, 1255 nn. 4, 5, Opn. No. 1063 and accompanying text (Alaska 1974); I Wright, Federal Practice & Procedure § 177 at 387–88 (1969).

21. We do not distinguish here between guilty pleas and pleas of nolo contendere, since the latter have the same direct consequences as the former.

22. Von Moltke v. Gillies, 332 U.S. 708, 721–722, 68 S.Ct. 316, 322–323, 92 L.Ed. 309, 319–320 (1948); see, e. g., Boyd v. Dutton, 405 U.S. 1, 92 S.Ct. 759, 30 L.Ed.2d 755 (1972); cf. Hamilton v. Alabama, 368 U.S. 52, 82 S.Ct. 157, 7 L.Ed.2d 114 (1961).

23. Colson v. Smith, 438 F.2d 1075, 1079 (5th Cir. 1971); Turley v. Swenson, 314 F. Supp. 1304 (W.D.Mo.1970).

tion for an evidentiary hearing. If counsel wishes to pursue the matter further, he is free to do so.

We briefly consider other points raised by appellant.

## II

■ Judge Moody and Judge Occhipinti were originally assigned the probation revocation hearing and the criminal prosecution, respectively. Both were peremptorily challenged under AS 22.20.022. Upon re-assignment, Judge Moody presided over the prosecution, while Judge Occhipinti handled the revocation proceedings. McKinnon claims that this "switching" of matters relating to the same defendant and the same operative facts deprived him of his statutory right of peremptory disqualification.

AS 22.20.022(a) provides:

(a) If a party or his attorney in a district court action or a superior court action, civil or criminal, files an affidavit alleging under oath that he believes that he cannot obtain a fair and impartial trial, the presiding district court or superior court judge, respectively, shall at once, and without requiring proof, assign the action to another judge of the appropriate court in that district, or if there is none, the chief justice of the supreme court shall assign a judge for the hearing or trial of the action. The affidavit shall contain a statement that it is made in good faith and not for the purpose of delay.

The enactment of this statute provides for disqualification without requiring any proof of prejudice or bias whatever.

■ A probation revocation hearing and a criminal prosecution may not be technically one and the same "action" within the meaning of the statute. But as a practical matter, the two proceedings against McKinnon involved identical issues. The basis for the probation revocation was the alleged commission of the crime for which the criminal prosecution was instituted. Both proceedings thus involved the same defendant and the necessity of proving the same facts. The exchange of assignments that occurred below frustrated the manifest legislative intent of AS 22.20.022, and was, accordingly, error. The filing of a peremptory challenge against Judge Moody in the probation revocation matter evidenced the defendant's belief that he could not receive a fair hearing before Judge Moody with respect to the charges upon which the institution of revocation proceedings was based. From that point on, Judge Moody was disqualified from presiding at any proceeding against the defendant in which those same charges were at issue. By parallel reasoning, after his peremptory disqualification in the criminal prosecution, Judge Occhipinti was deprived of the authority to act at the probation revocation hearing.

The state correctly maintains, however, that no objection was voiced below to the exchange of assignments. Consequently, unless the error can be deemed plain error, it is not cognizable at this time. In view of our disposition of this case, we need not decide whether the exchange constituted plain error.

## III

McKinnon correctly notes that the trial judge, in accepting McKinnon's plea, did not conform to the requirements of Crim. R. 11(c). The defendant contends that this oversight was reversible error. The provision states:

(c) The court shall not accept a plea of guilty or nolo contendere from a defendant without first addressing the defendant personally and

(1) determining that he understands the nature of the charge; and

(2) informing him that by his plea of guilty or nolo contendere he waives his right to trial by jury or trial by a judge and the right to be confronted with the witnesses against him; and

(3) informing him:

(i) of the mandatory minimum punishment, if any, and the maximum possible

punishment provided by the statute defining the offense to which the plea is offered, and

(ii) that the defendant has the right to plead not guilty or to persist in that plea if it has already been made, or to plead guilty.

■ Since McKinnon's conviction must be reversed at any rate, we decline to decide whether noncompliance with Crim.R. 11(c) will automatically vitiate a plea, as in the Federal courts,[24] or whether an inquiry into prejudice under a constitutional[25] or nonconstitutional harmless error standard is mandated. However, we do take this opportunity to stress the importance of addressing a defendant in accordance with Crim.R. 11(c) before accepting his guilty or nolo contendere plea, since such a practice insures that the plea is entered voluntarily and intelligently, and thereby insulates the ensuing conviction from appellate or post-conviction attack.

■ McKinnon also seeks to undermine the probation revocation hearing by attacking the legality of the 1973 conviction which led to his parole status. McKinnon alleges that his nolo contendere plea in the 1973 proceeding was also accepted without compliance with Crim.R. 11(c). The contention is procedurally inappropriate. All post-conviction challenges other than by direct appeal or motion after trial are governed by Crim.R. 35,[26] and Crim.R. 35(d) specifies that an application for post-conviction relief must be initiated in the trial court in which the conviction occurred.

### IV

McKinnon challenges the validity of his indictment. Officer Howe testified at the grand jury proceeding that in the course of negotiations for the sale of the cocaine, Knight told him that "Mr. McKinnon and he were partners and . . . the price had gone up to $1,050.00 rather than the $1,000.00 because the man Mr. McKinnon had gotten the dope from had raised his price."

■ Criminal Rule 6(r) requires that, "If hearsay evidence is presented to the grand jury, the reasons for its use shall be stated on the record."[27] In Taggard v. State,[28] we found in Crim.R. 6(r) the further requirement that the credibility of the hearsay declarant be established on the record "so that the grand jury may know how much weight to give the hearsay testimony."[29] Since the District Attorney did not explain to the grand jury why Knight was not called to testify in person, and since Knight's credibility was not demonstrated on the record, McKinnon concludes that the grand jury indictment must be quashed.

24. In McCarthy v. United States, 394 U.S. 459, 471–472, 89 S.Ct. 1166, 1173–1174, 22 L.Ed.2d 418, 428–429 (1969), the Supreme Court held that the failure to comply with F.R.Crim.Proc. 11 was reversible error per se.

25. Boykin v. Alabama, 395 U.S. 238, 243 n. 5, 89 S.Ct. 1709, 1712 n. 5, 23 L.Ed.2d 274, 279–280 n. 5 (1969), may be read as constitutionalizing Crim.R. 11(c); the cases are in conflict. *Compare* United States v. Escandar, 465 F.2d 438, 440 n. 6 (5th Cir. 1972); In re Tahl, 1 Cal.3d 122, 132, 81 Cal.Rptr. 577, 584, 460 P.2d 449, 456 (1969), cert. denied 398 U.S. 911, 90 S.Ct. 1708, 26 L.Ed.2d 72 (1970); People v. Jaworski, 387 Mich. 21, 194 N.W.2d 868, 871 (1972) *with* Lockett v. Henderson, 484 F.2d 62, 63–64 (5th Cir. 1973); Stinson v. Turner, 473 F.2d 913, 915–916 (10th Cir. 1973);

Wade v. Coiner, 468 F.2d 1059, 1060 (4th Cir. 1973); People v. Moore, 50 Ill.2d 24, 276 N.E.2d 318, 319 (1971).

26. *See* Crim.R. 35(c).

27. Crim.R. 6(r) states:
 Evidence which would be legally admissible at trial shall be admissible before the grand jury. In appropriate cases, however, witnesses may be presented to summarize admissible evidence if the admissible evidence will be available at trial. Hearsay evidence shall not be presented to the grand jury absent compelling justification for its introduction. If hearsay evidence is presented to the grand jury, the reasons for its use shall be stated on the record.

28. 500 P.2d 238 (Alaska 1972).

29. *Id.* at 243.

A review of the transcript of the grand jury proceedings, however, indicates that there was ample evidence upon which the grand jury based its indictment without regard to the questioned hearsay testimony. There was direct testimony that McKinnon accompanied Knight at the meeting with Officer Howe at the time and place which had been previously arranged for the sale of the cocaine. McKinnon engaged in the three-way conference to determine the place for carrying out the transaction and participated in an agreement to use a friend's apartment. McKinnon then accompanied Howe, the purchaser, and directed him to that apartment. When inside the apartment, McKinnon spoke with one of the people residing there arranging for the use of a bedroom. He then accompanied Knight and Howe to the bedroom where the sale was effected. Under the provisions of AS 12.15.010:

> [A]ll persons concerned in the commission of a crime, whether they directly commit the act constituting the crime or, . . . aid and abet in its commission, shall be prosecuted, tried, and punished as principals.

The District Attorney concluded his presentation before the grand jury with the introduction of another item of hearsay evidence—the laboratory analysis of the cocaine. Appellant asserts that our decision in *Taggard* required the District Attorney to establish independently the reliability of the technician who prepared the laboratory report, and that his failure to do so rendered the introduction of the report impermissible.

The contention is without merit. In *Taggard* we quashed the indictment because the complete absence of facts establishing the credibility of the hearsay declarant rendered the evidence supporting the indictment wholly unreliable. However, we suggested what quantum of credibility evidence is required when we said:

The informant testified at trial and explained his relationship with the police. He was an Alaska State Trooper who served at various times as an undercover narcotics agent in Fairbanks. We feel that it would have been sufficient to establish the informant's credibility if the police officer who testified before the grand jury had described informant's relationship with the police.[30]

Thus, we explicitly recognized that evidence of a hearsay declarant's professional status may justify the introduction of the declarant's hearsay statement in a grand jury proceeding in appropriate circumstances. Recently, in State v. Johnson,[31] we upheld the validity of an indictment based in part on hearsay testimony, where the unavoidably absent hearsay declarant was a store security guard and trained police officer whose statements were substantially corroborated by a testifying eyewitness. Although the eyewitness testimony was sufficient to support the indictment, we alternatively wrote that the declarant's professional status alone was "probably enough in itself to establish her credibility and reliability." [32]

By comparable reasoning, we believe that the credibility of the author of the laboratory report and the report itself was adequately established by the fact that the author was a technician at Alaska Medical Laboratories. The author's professional and objective position, of which the grand jury was aware, warranted the use of the laboratory analysis at the grand jury hearing. A professional laboratory technician has no motive to prevaricate, and he is presumptively qualified to perform chemical analyses in a competent manner. We also note that there is little a technician's physical presence at a grand jury proceeding could add to a laboratory report; the technician could do no more than affirm that he did perform the test reported, and that those tests did indicate the

30. 500 P.2d at 243, n. 17.

31. 525 P.2d 532, Opn. No. 1069 (Alaska 1974).

32. *Id.* at 536, Opn. No. 1069.

presence of a narcotic substance.[33] Vigorous cross-examination regarding the competence of the expert or the reliability of the test can hardly be expected in grand jury proceedings.

Since the conviction must be reversed for the reason set out above, we do not consider several other issues raised by the defendant which are immaterial to a retrial.

Reversed and remanded.

---

33. McKinnon contends that the laboratory tests employed by the state to detect the presence of cocaine are unreliable. Even if this is true, the invalidity of these tests would not reflect upon the *credibility* of the laboratory technician. The reliability of the analytical procedures utilized is a proper issue for trial, not an *ex parte* grand jury proceeding.