Phillip J. ADAMS, Appellant,

v.

STATE of Alaska, Appellee.

No. 3067.

Supreme Court of Alaska.

Aug. 9, 1979.

Chris J. Rigos, Asst. Public Defender, Brian C. Shortell, Public Defender, Anchorage, for appellant.

Glen C. Anderson, Asst. Dist. Atty., Joseph D. Balfe, Dist. Atty., Anchorage, Avrum M. Gross, Atty. Gen., Juneau, for appellee.

## AMENDED OPINION

Before BOOCHEVER, C. J., and RABINOWITZ, CONNOR, BURKE and MATTHEWS, JJ.

BURKE, Justice.

Phillip J. Adams was convicted of mayhem at the conclusion of a bench trial. On appeal he maintains that the speedy trial requirements of Rule 45, Alaska R.Crim.P., were violated; and he challenges the sufficiency of the evidence before the grand jury and at trial. We hold that the grand jury had insufficient evidence to indict Adams and reverse his conviction.

On August 28, 1975, Adams was arrested by an Anchorage police officer, Eugene Parmeter. The arrest was made after Parmeter saw Adams strike and kick Harry O'Neil during a street brawl. Adams was subdued at gunpoint, handcuffed, and taken to police headquarters. After being questioned about the incident, he was released. No formal charges were filed at that time.

On January 7, 1976, a complaint was filed charging Adams with mayhem under AS 11.15.140. The complaint was based upon the incident that occurred on August 28, 1975. Adams was arrested on the complaint on January 13, 1976, and an indictment was returned by the grand jury on January 23, 1976. Adams' court trial began on March 15, 1976, and he was found guilty as charged. This appeal followed.

## I. ALLEGED VIOLATION OF THE RIGHT TO A SPEEDY TRIAL

On March 12, 1976, Adams moved to dismiss the indictment upon the ground that the delay between his arrest and trial required dismissal under Rule 45, Alaska R.Crim.P. The superior court denied his motion.[1] We hold that the trial court correctly denied the motion.

Rule 45, Alaska R.Crim.P., provides in part:

(b) *Speedy Trial Time Limits.* A defendant charged with either a felony or a misdemeanor shall be tried within 120 days from the time set forth in section (c).

(c) *When Time Commences to Run.* The time for trial shall begin running without demand by the defendant, as follows:

(1) From the date the defendant is arrested, initially arraigned, or from the date the charge (complaint, indictment, or information) is served upon the defendant, whichever is first. . . .

. . . . .

(g) *Absolute Discharge.* If a defendant is not brought to trial before the running of the time for trial, as extended by excluded periods, the court upon motion of the defendant shall dismiss the charge with prejudice. Such discharge bars prosecution for the offense charged and for any other lesser included offense within the offense charged.

Initially, we must determine when Adams' rights under Rule 45 attached. He argues that he should have been brought to trial within 120 days after his arrest on August 28, 1975. The state contends that

---

1. Adams' motion to dismiss was heard by Judge Seaborn J. Buckalew. Judge Peter J. Kalamarides presided over the trial of his case.

the speedy trial requirements of Rule 45 did not attach on August 28 because Adams was released at that time without the filing of a formal charge.

The state relies on *Yarbor v. State*, 546 P.2d 564 (Alaska 1976). In *Yarbor* we held that the defendant's constitutional right to a speedy trial did not attach at the time he was questioned by police concerning alleged lewd acts toward a child, *i. e.*, the time "when the state [had] acquired sufficient evidence to charge [the defendant] with a crime." We held that such right attached only after he was "formally accused" by the later filing of a complaint. *Id.* at 566–67. Our opinion, however, clearly indicates that, for purposes of the right to speedy trial, one is also "formally accused" when arrested: "[W]e now join our sister states in holding that the right to a speedy trial does not attach before the defendant becomes formally accused—that is, the subject of a filed complaint *or an arrest.*" *Id.* at 567 (emphasis added; footnotes omitted).

■ The case at bar differs from *Yarbor* in two major respects. First, *Yarbor* involved the speedy trial guarantee found in article I, section 11 of the Constitution of Alaska, which, unlike Rule 45, contains no express provision that it attaches upon the "arrest" of the defendant. Second, although not clearly stated in our published opinion, it is quite apparent that the defendant in *Yarbor* had not been arrested prior to service of the formal complaint. Adams, on the other hand, was apprehended at gunpoint, then handcuffed and transported to police headquarters for questioning as a result of the acts forming the basis for the mayhem charge. We think it beyond question that Adams was "arrested" on August 28, 1975, within the meaning of Rule 45. *See* AS 12.25.050; 12.25.160; *Richardson v. State*, 563 P.2d 266, 268 n.2 (Alaska 1977).

For the foregoing reasons, we hold that the state's reliance on *Yarbor* is misplaced and that Adams' rights under Rule 45 attached at the time of his arrest on August 28, 1975.

■ Since Adams was not brought to trial within 120 days from the date of his arrest, he was entitled to a dismissal of the charge against him, with prejudice, unless the time for his trial was extended because of "excluded periods." Rule 45(g), Alaska R.Crim.P. Subsection (d) of Rule 45 provides that periods of delay resulting from certain events "shall be excluded in computing the time for trial," including "periods of delay for good cause." Rule 45(d)(7), Alaska R.Crim.P. The state contends that, because of uncertainty as to the physical condition of the victim, Harry O'Neil, the delay in filing a formal charge and proceeding to trial was for "good cause" and should thus be excluded in computing the time for trial under the rule. We agree.

Following the altercation on August 28, 1975, O'Neil was taken to a hospital. At that time he was unconscious. Officer Parmeter was advised later in the day by Dr. Alex Dubelman, an attending physician, that O'Neil had suffered injury to an artery in his brain and had little or no chance to live. Parmeter testified before the grand jury on January 21, 1976, that O'Neil thereafter remained "in a comatose state" and that he was not expected to live much longer. At trial Dr. Richard Anschuetz testified that he treated O'Neil following his admission to the hospital until his discharge on September 22, 1975. According to Dr. Anschuetz, O'Neil had a fractured skull accompanied by intracranial bleeding and swelling of the brain. Holes were drilled in the skull to relieve pressure caused by the trauma suffered, but such efforts apparently failed to relieve the symptoms. On the day of his discharge O'Neil's mental state had not improved, and he was developing complications, including secondary softening of the brain tissue caused by the blood surrounding it. O'Neil was seen again by Officer Parmeter at the time of trial. Parmeter described his condition at that time as follows:

[I] saw Mr. O'Neil in bed in what I would term . . . a partial fetal position with the hands in . . . a frozen claw-like manner. Face was contorted, mouth out of shape. There was apparat-

us up his nose to take off saliva drainage and it appeared [that there was] saliva around the mouth. . . .

O'Neil made a sound, but "it wasn't speech," although it appeared to Parmeter that O'Neil's eyes followed another person that was in the room.

■ Given the foregoing, there can be no doubt that from the time of Adams' arrest on August 28, 1975, to and including the date upon which the complaint was filed, January 7, 1976, there was good reason to believe that O'Neil might die at any moment. The state had to proceed in one of two ways: it could bring an immediate, non-homicide charge, such as mayhem, or it could delay the filing of any charge, as it elected to do, in order to determine whether O'Neil's injuries would prove fatal. We think the state was entitled to delay the filing of a specific charge for a reasonable period of time and that such period of delay must be excluded in computing the time for Adams' trial under Rule 45.[2]

■ Accordingly, we hold that the period from Adams' arrest on August 28, 1975, to and including the date of filing of the complaint, January 7, 1976, must be excluded in computing the time for Adams' trial under Rule 45. We do so in the belief that this period is excludable as delay incurred "for good cause," within both the letter and spirit of Rule 45(d)(7), Alaska R.Crim.P.[3]

Since fewer than 120 *additional* days elapsed between Adams' arrest and the trial, there was no violation of his right under Rule 45.

## II. CHALLENGE TO THE INDICTMENT

Adams maintains that hearsay testimony was improperly presented to the grand jury that indicted him and that such testimony should invalidate the indictment. We agree.

Adams brings to our attention two instances where Officer Eugene Parmeter testified to the grand jury about statements made to him by out-of-court declarants. Specifically, Officer Parmeter repeated statements made by Dr. Alex Dubelman, who treated the victim on his admission to the hospital, regarding the nature of the injury, its possible cause, the condition of the victim, and his prognosis for recovery. Officer Parmeter also related statements made to him shortly before his grand jury appearance by an unidentified hospital spokesperson about the victim's condition at that time and his limited chances for survival.

On February 9, 1976, Adams made a timely motion to dismiss the indictment on the ground that critical portions of the testimony before the grand jury were hearsay presented without compelling justification. The motion was denied.

**2.** Once jeopardy attached under a lesser charge, Adams might well have claimed that the double jeopardy provisions of the state and federal constitutions barred any later prosecution for murder or manslaughter in the event O'Neil died. The cases that we have found all hold to the contrary, but the issue has not been decided in this jurisdiction. *See, e. g., State v. Wilson,* 85 Ariz. 213, 335 P.2d 613 (1959); *State v. Randolph,* 61 Idaho 456, 102 P.2d 913, 915 (1940); *People v. Harrison,* 395 Ill. 463, 70 N.E.2d 596, 599 (Ill.1946), *cert. denied,* 344 U.S. 812, 68 S.Ct. 1013, 92 L.Ed. 1744 (1948); Annot., 37 A.L.R.2d 1068, 1072 (1954). This lack of certainty alone provided justification for the state's decision to delay the filing of a specific charge in this case.

In addition, the public's interest in avoiding two trials favors such action, even if a second trial were possible.

**3.** This case is distinguishable from *Peterkin v. State,* 543 P.2d 418 (Alaska 1975). *Peterkin*

involved a charge of assault with a dangerous weapon. In that case we held that the inability of an injured assault victim to testify against his alleged assailant did not come within the general "good cause" provisions of Rule 45(d)(7) once the victim's condition had stabilized. We also held that, even before his condition stabilized, unavailability of the victim would not be considered delay for "good cause" under Rule 45(d)(7) because unavailability of a witness is a contingency specifically covered by Rule 45(d)(3)(a), which expressly requires a timely motion for a continuance. 543 P.2d at 423–24. In *Peterkin* a specific charge had been filed, and the only reason for delay was the unavailability of a material witness. Here, we view the issue as being whether the delay in bringing a specific charge was justified and, if so, whether such delay should be excluded for good cause.

In Alaska, hearsay testimony which is not subject to a recognized exception to the hearsay rule may be presented to the grand jury only upon a showing of "compelling justification." Rule 6(r), Alaska R.Crim.P.[4] We have held that, for purposes of interpreting Rule 6(r), "compelling" is to be equated with "necessity." *State v. Gieffels*, 554 P.2d 460, 464–65 (Alaska 1976). We have found "necessity" where a witness is unavoidably absent from the jurisdiction. *State v. Johnson*, 525 P.2d 532, 536 (Alaska 1974). *See Gieffels*, 554 P.2d at 464; *McKinnon v. State*, 526 P.2d 18, 27 (Alaska 1974). We have also found "necessity" where a witness could not testify without violating the privilege against self-incrimination. *Galauska v. State*, 527 P.2d 459, 465 (Alaska 1974). On the other hand, we have found no "necessity" where the cost of transporting a witness was the reason advanced for using the hearsay. *Gieffels*, 554 P.2d at 464–65.

■ The reasons offered in this case, however, are inadequate to justify the use of hearsay. After the absent doctor's statement was presented, the district attorney gave as justification for the hearsay the prohibitive expense of bringing the doctor before the grand jury. This is clearly inadequate under our holding in *Gieffels*.

Moreover, the transcript of the grand jury proceeding reveals that the district attorney gave *no* justification for the absence of the hospital spokesperson. The admission of hearsay testimony, therefore, was improper in both instances.

■ The improper introduction of hearsay testimony will invalidate an indictment unless there is evidence, standing alone and uncontroverted, that would justify a conviction. *Webb v. State*, 527 P.2d 35, 36 (Alaska 1974); *McKinnon*, 526 P.2d at 27.

■ To justify Adams' conviction for mayhem, the state would have to present evidence on each of the elements in the prima facie case. The state must prove (1) that Adams had a malicious intent to maim or disfigure the victim; (2) that he used a dangerous instrument;[5] and (3) that permanent injury or disfigurement resulted.[6] If the state presented admissible evidence of each of these elements to the grand jury, the improper introduction of hearsay would be harmless. The state did present other admissible evidence to the grand jury that was sufficient to show two of the elements, the requisite malicious intent to maim by the requisite means of a dangerous instrument.[7] The only evidence of permanent

---

4. Rule 6(r), Alaska R.Crim.P., provides in part: "Hearsay evidence shall not be presented to the grand jury absent compelling justification for its introduction. If hearsay evidence is presented to the grand jury, the reasons for its use shall be stated on the record."

5. See AS 11.15.140 which provides:
 *Mayhem.* A person who, with malicious intent to maim or disfigure: (1) cuts, bites, or slits the nose ear, or lip, cuts out or disables the tongue, puts out or destroys an eye, cuts off or disables a limb or any member of another person; or (2) throws or pours upon or throws at another person, any scalding hot water, vitriol, or other corrosive acid or caustic substance; or (3) assaults another person with a dangerous instrument, is punishable by imprisonment in the penitentiary for not more than 20 years nor less than one year.

6. AS 11.15.140 does not explicitly require proof of permanent injury or disfigurement as an element of the offense of mayhem, but it is generally held that mayhem implies some permanent injury or crippling. *See* R. Perkins, Criminal Law 187 (1969); 57 C.J.S. *Mayhem*

§ 3 at 466 (1948). At common law mayhem was defined as the loss of the use of a member which rendered one less able to defend oneself or to annoy an adversary. *United States v. Cook*, 149 U.S.App.D.C. 197, 198, 462 F.2d 301, 302 (1972); *State v. Trujillo*, 54 N.M. 307, 224 P.2d 151, 152–53 (1950). Modern statutes have shifted the focus of mayhem from the combative effects of an injury to the impairment of the normal functioning of the human body. *Cook*, 149 U.S.App.D.C. at 199, 462 F.2d at 303. All jurisdictions, however, still require some permanence of injury or disfigurement. *See, e. g.,* *Lamb v. Cree*, 86 Nev. 179, 466 P.2d 660, 662–63 (1970); *State v. Raulie*, 40 N.M. 318, 59 P.2d 359 (1936). We therefore construe AS 11.15.-140 to require proof of some permanent injury or disfigurement.

7. The bulk of this evidence was presented by Officer Parmeter, who witnessed the attack and made the arrest. According to Officer Parmeter's testimony, he saw four individuals chasing another person. He then witnessed a brief altercation between these persons in the middle of the intersection at 4th and C Streets.

disablement or injury, however, was that contained in the inadmissible hearsay testimony. Because the evidence standing alone would not justify a conviction, the grand jury did not have enough evidence before it to indict Adams of mayhem. Thus, the indictment was invalid.

### III. CHALLENGE TO THE SUFFICIENCY OF THE EVIDENCE AT TRIAL

■ At the conclusion of the state's case, Adams moved for acquittal on the ground that the evidence produced at trial was insufficient to sustain a conviction. He maintains on appeal that the evidence was insufficient to establish two elements of the prima facie case: (1) that the victim suffered permanent physical injury; and (2) that Adams acted with malicious intent to main or disfigure.[8]

■ We first address whether there was sufficient evidence of permanent physical injury. At trial Dr. Anshuetz and Officer Parmeter testified on the victim's physical condition. Dr. Anshuetz described the nature of the head injuries and his treatment of them on August 28, 1975. He also testified that on September 22, 1975, the victim had not improved and was developing complications. Officer Parmeter had observed the victim on March 16, 1976, and he described the victim's serious condition on that date.[9] We find that this testimony creates a reasonable inference of permanent injury to the brain sufficient to support a finding of permanent physical injury.

■ We also find sufficient evidence to support a finding of malicious intent to maim or disfigure. The language "mali-

cious intent to maim or disfigure" requires a *specific intent* to maim and disfigure. *See* R. Perkins, Criminal Law 186 (1969). Direct evidence of a defendant's mental state is rarely available; and normally, this element must be proved by circumstantial evidence. The general rule is that a factfinder may infer a defendant's mental state from a voluntary act that produces as its natural and probable consequence an unlawful result in the absence of any circumstances inconsistent with such an inference. *Id. See United States v. Haldeman*, 181 U.S.App.D.C. 254, 334–36, 559 F.2d 31, 114–16 (1976), *cert. denied*, 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977); *State v. Tyler*, 77 Wash.2d 726, 466 P.2d 120, 135 (1970), *vacated as to imposition of death penalty*, 408 U.S. 937, 92 S.Ct. 2865, 33 L.Ed.2d 756 (1972); *Fuller v. State*, 568 P.2d 900, 904 (Wyo.1977).

■ This rule does not shift the burden of proof to the defendant; rather, the state must prove from the totality of circumstances that *this* defendant intended to produce the results that were the natural and probable consequences of his acts. The state must show not only that the act took place but also the requisite specific intent demonstrated by evidence of motive, the means employed to produce the injury, and the parts of the body attacked.

■ The circumstantial evidence in this case does adequately support an inference that Adams acted with malicious intent to maim or disfigure the victim. After being pushed by the victim, Adams pursued him with determination. When he caught the victim, he pushed him off balance and delivered a forceful kick to his head. A

---

He yelled, "Police officer!" with no apparent result. The individual that was being chased broke away from the fight, began running, but was caught by Phillip Adams. At that point Adams spun the person around and struck him in the chest. The person staggered into a half-sitting position, whereupon Adams kicked him in the face. The individual fell backwards violently, his head striking the pavement. This testimony was substantially corroborated by the defendant's statement, which was also presented to the grand jury.

8. The standard of review to be applied to a denial of a motion for acquittal is whether fairminded persons could reasonably differ on whether guilt has been established beyond a reasonable doubt. In applying this standard, we must view the evidence and the inferences to be drawn in the light most favorable to the state. *McCurry v. State*, 538 P.2d 100, 101 (Alaska 1975); *Beavers v. State*, 492 P.2d 88, 97–98 (Alaska 1971).

9. For a discussion of the testimony, see part I of this opinion.

shod foot can be a dangerous instrument. *Ransom v. State,* 460 P.2d 170 (Alaska 1969); *Berfield v. State,* 458 P.2d 1008 (Alaska 1969). In addition, Adams delivered the kick to the head. A forceful kick to the head can easily damage the function of important organs and result in permanent cosmetic damage as well. Thus, the circumstantial evidence in this case is sufficient to permit an inference that the appellant acted with malicious intent to maim or disfigure.

 The state presented sufficient evidence at trial to sustain a conviction of mayhem; but because the trial followed an invalid indictment, we must reverse the conviction. If we were to find that a trial could validate an otherwise invalid indictment, the right to indictment by a grand jury [10] would become a nullity and the grand jury would cease to operate as a check upon the district attorney's power to initiate prosecution.[11]

We therefore REVERSE.

**10.** Alaska Const. art. I, § 8, provides in part: "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a grand jury, except in cases arising in the armed forces in time of war or public danger."

**11.** We have stated that the purpose served by grand jury indictment is to give one accused of a serious offense the benefit of having private citizens judge whether there is probable cause to hold the accused for trial. The grand jury protects the innocent from unjust prosecution by acting as a check on the prosecutor. *Doe v. State,* 487 P.2d 47, 54 (Alaska 1971); *State v. Shelton,* 368 P.2d 817, 819 (Alaska 1962).