*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| ALVIN E. WASSILLIE, | ) | |
| | ) | Supreme Court No. S-16239 |
| Petitioner, | ) | Court of Appeals No. A-11080 |
| | ) | |
| v. | ) | Superior Court No. 3AN-10-01901 CR |
| | ) | |
| STATE OF ALASKA, | ) | O P I N I O N |
| | ) | |
| Respondent. | ) | No. 7222 – February 16, 2018 |
| | ) | |

Petition for Hearing from the Court of Appeals of the State of Alaska, on appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Michael L. Wolverton, Judge.

Appearances: Josie Garton, Assistant Public Defender, and Quinlan Steiner, Public Defender, Anchorage, for Petitioner. Diane L. Wendlandt, Assistant Attorney General, and Jahna Lindemuth, Attorney General, Anchorage, for Respondent.

Before: Stowers, Chief Justice, Maassen, Bolger, and Carney, Justices, and Eastaugh, Senior Justice.[*] [Winfree, Justice, not participating.]

MAASSEN, Justice.
BOLGER, Justice, with whom STOWERS, Chief Justice, joins, dissenting in part.

---

[*] Sitting by assignment made under article IV, section 11, of the Alaska Constitution and Alaska Administrative Rule 23(a).

## I.    INTRODUCTION

A jury found a criminal defendant guilty of escaping from a halfway house, and the court of appeals affirmed his conviction. We granted a petition for hearing on the issue of whether the conviction should be overturned because of the invalidity of the grand jury's indictment. The defendant argues that the indictment was based on inadmissible hearsay evidence — an incident report prepared by a staff member at the halfway house, relaying another resident's description of the defendant's conduct and introduced to the grand jury through the testimony of an uninvolved supervisor. The State counters that the incident report falls under the business records exception to the hearsay rule, and that even if it is inadmissible hearsay the conviction should not be reversed because any error in the grand jury proceeding was later made harmless by the error-free trial.

We hold that the incident report does not fall under the business records exception to the hearsay rule and should have been excluded. Because the evidence was otherwise insufficient to support the grand jury's decision to indict, the indictment was invalid and the conviction must be reversed. We decline the State's invitation to overrule our precedent requiring this result. We therefore reverse the court of appeals' decision affirming the conviction.[1]

## II.    FACTS AND PROCEEDINGS

### A.    Facts

In early 2010 Alvin Wassillie was serving out the remainder of a felony sentence at the Parkview Center halfway house in Anchorage. On February 19 he left Parkview on a pass to look for a job. Around the time of his return that afternoon a staff

---

[1]    We commend both parties' counsel for the excellence of their briefs and arguments.

member saw someone toss a white bag through an open window into an upstairs room. Other staff members searched the room and found a white bag with a bottle of vodka in it.

Parkview's security manager, Joshua Henry, reviewed footage from security cameras and identified Wassillie as the person who threw the bag (and presumably the vodka) into the building. Bringing alcohol into the facility is a violation of its rules, so Henry told Wassillie to wait in the lobby while he prepared a report and contacted the Department of Corrections (DOC) to take Wassillie back to jail.

After waiting several hours in the lobby, Wassillie walked out of the facility. Another inmate, Jason Lavin, reported Wassillie's departure to a staff member, and the staff confirmed from security videos and two headcounts that Wassillie had left without signing out.

Staff member Eric Dulany filled out the "Incident Report" form that is central to this case. The report related Lavin's statement that Wassillie had walked out of the facility and briefly described the staff's commencement of Parkview's escape procedures.[2] The Parkview staff also completed an absence report, in which they

---

[2]     The entire narrative of the incident report is as follows:

Wassillie Alvin was reported missing to myself when I approached Lavan [sic] Jason about him wanting to fight someone at 1930. He reported that Wassillie Alvin was the one that through [sic] the Vodka in his room in an attempt to get him in trouble. He also stated then [Wasillie] just left through the front door at 1719[.] I checked Wassillie's room and paged for him twice with no success . [Grygurko, another staff member,] and I were doing the room searches on 501 and 201 at 1625 to 1655[.] [Grygurko] went straight upstairs to continue the head count on second and third floors and I

(continued...)

initialed and time-stamped a series of actions taken as part of the standard escape procedures.

Police found Wassillie a few miles away several hours after he left and took him into custody. He was taken to jail and later charged with second-degree escape.[3]

## B.    Proceedings

A grand jury considered the charges in March 2010 and heard from two witnesses, neither of whom had first-hand knowledge of Wassillie's conduct. A probation officer testified that Wassillie had been serving a felony sentence while at Parkview. Parkview's director, Robert Graber, testified that when an inmate goes missing Parkview staff complete "a discharge summary report and a[n] escape report and an incident report which tells about the escape . . . within two hours of the . . . notice that a resident is missing." He testified that copies of the reports are sent to the Department of Corrections and that the originals are placed in the inmate's Parkview file, which is kept for five years. Graber testified that Parkview "regularly keep[s] and maintain[s] these [forms]." With this foundation, the State presented to the grand jury the "resident discharge summary, incident reports, intake packet paperwork, [and an] escape report."[4] Graber testified about Wassillie's escape from the facility based on the information he

---

**2**      (...continued)
did the 15 min[.] walkthrough. I attempted to call Josh and DID call Bob notifying him on [sic] the runaway at 1945. Building on lockdown[;] escape procedures started.

**3**      *See* AS 11.56.310(a)(1)(B).

**4**      Our record, and a submission by Wassillie's counsel following oral argument, show that the grand jury exhibit contained the "Incident Report," a "Resident Discharge Summary," an "Absence Report," and several pages of intake paperwork.

had obtained from the reports. After considering this evidence the grand jury indicted Wassillie for second-degree escape, a felony.

Wassillie was tried in December 2010, but the jury was unable to reach a verdict, and the superior court declared a mistrial. A month later Wassillie moved to dismiss the indictment, arguing in part that the prosecutor had improperly relied on inadmissible hearsay at the grand jury proceeding. The court denied the motion without comment.

Wassillie was tried again in April and May 2011. The jury heard testimony from Dulany, the Parkview employee who had prepared the incident report, and several other staff members with first-hand knowledge of Wassillie's departure from the facility. The second jury returned a guilty verdict.

Wassillie appealed. He argued to the court of appeals that it was error to deny his motion to dismiss the indictment because the indictment was based on Dulany's incident report, which was inadmissible hearsay. The court of appeals held, however, that the report "was presumptively admissible under the business records hearsay exception" and affirmed Wassillie's conviction.[5]

Wassillie petitioned for hearing. We granted his petition so we could consider two questions: first, whether the incident report was admissible as a business record under Alaska Evidence Rule 803(6); and second, if it was not, whether the presentation of the incident report to the grand jury was necessarily harmless because of Wassillie's subsequent conviction following an error-free trial.

III. STANDARDS OF REVIEW

"When the admissibility of evidence 'turns on a question of law, such as the "correct scope or interpretation of a rule of evidence," we apply our "independent

---

[5]     *Wassillie v. State*, 366 P.3d 549, 552-54 (Alaska App. 2016).

judgment." ' "[6] We apply the same standard of review to "constitutional issues of law," such as the scope of a party's right to indictment by grand jury.[7] In exercising our independent judgment on such issues "we will adopt 'a reasonable and practical interpretation in accordance with common sense based upon "the plain meaning and purpose of the provision and the intent of the framers." ' "[8] And in determining the appropriate remedy for an error in a grand jury proceeding, we will "adopt the rule of law that is most persuasive in light of precedent, reason, and policy."[9]

## IV. DISCUSSION

Wassillie first challenges the evidence on which the grand jury decided to indict him. Of the evidence presented to the grand jury, only the incident report describes Wassillie's departure from Parkview and contains enough information, if admissible, to apprise the jury of the facts of his alleged offense; our discussion therefore focuses on this one-page document.[10] Wassillie argues that the incident report was inadmissible hearsay; that without it the evidence was insufficient to support an

---

[6] *Sanders v. State*, 364 P.3d 412, 419-20 (Alaska 2015) (omission in original) (quoting *Barton v. N. Slope Borough Sch. Dist.*, 268 P.3d 346, 350 (Alaska 2012)).

[7] *Cameron v. State*, 171 P.3d 1154, 1156 & n.6 (Alaska 2007); *Simpson v. Murkowski*, 129 P.3d 435, 440 (Alaska 2006).

[8] *Simpson*, 129 P.3d at 440 (quoting *Alaska Legislative Council v. Knowles*, 21 P.3d 367, 370 (Alaska 2001)).

[9] *Cameron*, 171 P.3d at 1156 (quoting *Alderman v. Iditarod Props., Inc.*, 32 P.3d 373, 380 (Alaska 2001)).

[10] The "Absence Report" documents only the steps taken by Parkview staff following their discovery of Wassillie's absence. The "Resident Discharge Summary" notes that Wassillie was discharged for a "Violation" but does not describe it. The remaining few pages of records are from Wassillie's intake a month before the incident for which he was charged.

indictment; and that because the indictment was invalid his conviction must be reversed under the rule we applied in *Adams v. State*.[11]

The State disagrees. It argues that the incident report was admissible under the business records exception to the hearsay rule;[12] it also argues that even if the incident report contained inadmissible hearsay, we should not reverse Wassillie's conviction because any error in the grand jury proceeding was made harmless by his subsequent conviction by a petit jury in an error-free trial. To reach this result the State asks that we overrule contrary holdings in both *Adams* and *Taggard v. State*.[13]

We conclude that the incident report was not admissible under the business records exception to the hearsay rule. Because without the report the evidence before the grand jury was insufficient to support an indictment, we go on to consider whether this error was rendered harmless by Wassillie's later conviction in an error-free trial. We decide that the error was not rendered harmless; our precedent, which we decline to overrule, requires that the conviction be reversed.

## A. The Incident Report Was Not Admissible Under The Business Records Exception To The Hearsay Rule.

"Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."[14] As a general rule hearsay statements are inadmissible at trial unless they fall

---

[11] 598 P.2d 503 (Alaska 1979).

[12] Alaska R. Evid. 803(6).

[13] 500 P.2d 238 (Alaska 1972).

[14] Alaska R. Evid. 801(c).

under an enumerated exception or exclusion;[15] the same general rule applies to grand jury proceedings.[16]

The only hearsay exception the State argues applies here — the business records exception[17] — requires that a record satisfy five requirements in order to be admitted:

> first, the record must be of a "regularly conducted business activity"; second, the record must "be regularly kept"; third, the source of information "must be a person who has personal knowledge"; fourth, the information must have been "recorded contemporaneously with the event or occurrence"; and fifth, "foundation testimony by the custodian of the record" must be provided.[18]

---

[15] Alaska R. Evid. 801(d) (exclusions from hearsay rule); Alaska R. Evid. 802 (hearsay rule); Alaska R. Evid. 803 (exceptions to hearsay rule); Alaska R. Evid. 804 (additional exceptions).

[16] Alaska R. Evid. 101 (general applicability of evidence rules); Alaska R. Crim. P. 6(r)(1) ("Evidence which would be legally admissible at trial shall be admissible before the grand jury. . . [And] hearsay evidence shall not be presented to the grand jury absent compelling justification for its introduction.").

[17] Alaska R. Evid. 803(6) ("exclud[ing]" from the hearsay rule "[a] memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge acquired of a regularly conducted business activity, and if it was the regular practice of that business activity to make and keep the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness").

[18] *Noffke v. Perez*, 178 P.3d 1141, 1147 (Alaska 2008) (quoting 4 CHRISTOPHER B. MUELLER & LAIRD C. KIRKPATRICK, FEDERAL EVIDENCE § 8:78 (3d ed. 2007)).

Wassillie contends that the Parkview incident report lacked the trustworthiness of reports prepared as part of a "regularly conducted business activity." He argues that "[r]eports of this character are not routine, ministerial, objective, or created in a nonadversarial setting." He also argues that the incident report was prepared in anticipation of litigation, further undermining its trustworthiness. For the reasons that follow, we agree.

### 1.     The principles behind the business records exception

The tradition of excepting business records from the hearsay rule derives from the "unusual reliability of business records . . . supplied by systematic checking, by regularity and continuity which produce habits of precision, by actual experience of business in relying upon them, or by a duty to make an accurate record as part of a continuing job or occupation."[19] Traditionally, business records are "routine reflections of the day to day operations of a business."[20] It follows that routinely prepared records such as "payrolls, accounts receivable, accounts payable, bills of lading,"[21] inventory property listings,[22] medical records,[23] and social security records[24] are ordinarily admissible under the business records exception.

Whether a report has been prepared in the regular course of business is measured by whether the circumstances of its preparation give the report "the reliability

---

[19]     Alaska R. Evid. 803(6) cmt.

[20]     *Palmer v. Hoffman*, 318 U.S. 109, 114 (1943).

[21]     *Id.*

[22]     *Hayes v. State*, 581 P.2d 221, 222 n.1 (Alaska 1978).

[23]     *Dobos v. Ingersoll*, 9 P.3d 1020, 1027 (Alaska 2000) ("[M]edical records, including doctors' chart notes, opinions, and diagnoses, fall squarely within the business records exception to the hearsay rule.").

[24]     *Noffke v. Perez*, 178 P.3d 1141, 1147 (Alaska 2008).

business records are ordinarily assumed to have."[25]  A court considering the record's admissibility may take into account "such factors as . . . the purpose for which the record was prepared," "any possible motive to falsify including whether the record's use in prospective litigation was a motive for its preparation," "how routine or non-routine the record is," and "how much reliance the business places on the record for business purposes."[26]

To apply these principles to the facts of this case, we are helped by the landmark case of *Palmer v. Hoffman*, in which the United States Supreme Court considered whether an accident report prepared by a railroad engineer was a business record under the analogous federal rule.[27]  Concluding that it was not, the Court held that "the fact that a company makes a business out of recording its employees' versions of their accidents does not put those statements in the class of records made 'in the regular course' of the business within the meaning of" the business record exception.[28] " '[R]egular course' of business must find its meaning in the inherent nature of the business in question and in the methods systematically employed for the conduct of the business as a business."[29]  In *Palmer* the accident report's "primary utility [wa]s in litigating, not in railroading"; accordingly, that kind of report, even if regularly prepared,

---

[25]     2 KENNETH S. BROUN ET AL., MCCORMICK ON EVIDENCE § 288 (7th ed. 2016); *see also* 2 FRED LANE, LANE GOLDSTEIN TRIAL TECHNIQUE § 12:59 (3d ed. 2016).

[26]     *Owens-Illinois, Inc. v. Armstrong*, 604 A.2d 47, 50-51 (Md. 1992).

[27]     318 U.S. 109, 110-15 (1943).

[28]     *Id.* at 113.

[29]     *Id.* at 115.

lacked "the character of [business] records and their earmarks of reliability acquired from their source and origin and the nature of their compilation."[30]

## 2. Factors affecting the reliability of certain kinds of reports

A number of federal and state courts have held that investigative reports such as police reports[31] and correctional facility incident reports[32] are inadmissible

---

[30] *Id.* at 114.

[31] *See, e.g.*, *United States v. Weiland*, 420 F.3d 1062, 1074-75 (9th Cir. 2005); *Oliver v. State*, 475 So. 2d 655, 656 (Ala. Crim. App. 1985); *People v. Richardson*, 362 N.E.2d 1104, 1106 (Ill. App. 1977); *Solomon v. Shuell*, 457 N.W.2d 669, 678-82 (Mich. 1990).

[32] *See, e.g.*, *Bracey v. Herringa*, 466 F.2d 702, 703-05 (7th Cir. 1972) (holding that business records exception did not apply to prison records, including guards' "conduct reports," that "included the self-serving statements of the defendants" and other guards potentially subject to liability); *People v. Smith*, 565 N.E.2d 900, 912-17 (Ill. 1990) (finding that prison incident reports lacked the trustworthiness and reliability of regularly kept business records and thus were not admissible); *Peschetta v. Commonwealth*, 12 N.E.3d 1053, 2014 WL 3858378, *2 (Mass. App. 2014) (unpublished table decision) (holding that correctional officers' reports incorporating inmates' statements were not admissible as business records); *Bermen v. State*, 798 S.W.2d 8, 12 (Tex. App. 1990) (holding that prison escape report was inadmissible because it was not prepared "as a result of ministerial objective observations" and lacked "the necessary indicia of reliability"); *Layton City v. Pronek*, 803 P.2d 1294, 1296, 1298 (Utah App. 1990) (holding that jail incident report noting inmate's consumption of alcohol was not prepared in the regular course of business but rather was an "investigatory report intended for prosecutorial purposes").

*But cf. United States v. Chong*, 98 F. Supp. 2d 1110, 1118-19 (D. Haw. 1999) (holding that prison disciplinary records were admissible under business records exception for sentencing phase); *State v. Brooks*, 394 S.W.3d 454, 456 (Mo. App. 2013) (holding that jail incident reports were admissible at sentencing); *Paey Assocs., Inc. v. Pa. Liquor Control Bd.*, 78 A.3d 1187, 1195 (Pa. Commw. 2013) (holding that police incident reports were admissible at administrative agency hearing if officers who created

(continued...)

because of reliability concerns. The Alaska *public* records exception[33] to the hearsay rule similarly exempts all "investigative reports by police and law enforcement personnel" from the exception "because they are often unreliable";[34] it also states that "investigative reports prepared by or for a government, a public office or an agency when offered by it in a case in which it is a party" do not fall within the public records exception.[35]

But investigative reports from state agencies that are not admissible under the *public* records exception may be admissible under the *business* records exception when the agency "has no motive to attempt to affect the outcome in a particular case" and the report meets the other elements of the business records exception.[36] This is

---

[32]   (...continued)
the reports attested to preparing them).

[33]   Alaska R. Evid. 803(8).

[34]   *See* Alaska R. Evid. 803(8) cmt. (citing *Menard v. Acevedo*, 418 P.2d 766 (Alaska 1966)); *cf. Rockwell v. State*, 176 P.3d 14, 26 (Alaska App. 2008) (holding that passport stamps and immigration card were admissible because they "were not made and maintained for the primary purpose of criminal investigations, and the government employees who stamped the documents performed a ministerial duty that had nothing to do with prosecuting a particular person for criminal activity").

[35]   Alaska R. Evid. 803(8)(b)(ii). The incident report in this case would be inadmissible under the public records exception because it is investigative in nature, it was prepared by an agent of the DOC, and it was used by the State in a case in which the State is a party.

[36]   *State v. Huggins*, 659 P.2d 613, 616 (Alaska App. 1982) ("An official would have no motive to misrepresent those facts [regarding breathalyzer calibration and certification] because the nexus between his findings and a particular result on a particular prosecution is too attenuated."); *see also Wilson v. State*, 756 P.2d 307, 313 (Alaska App. 1988). *Contra United States v. Oates*, 560 F.2d 45, 78 (2d Cir. 1977); *State v. Hammel*, 917 A.2d 1267, 1271 (N.H. 2007) ("[T]he business records exception cannot be used as a 'back door' to introduce evidence that would not be admissible under
(continued...)

because a reporter with "no knowledge of a specific case" is presumed to have "no incentive to misrepresent."[37] For instance, a breathalyzer certification by a state official at the Department of Health and Social Services who has "no knowledge of a specific case" is reliable enough to be admissible.[38] And "routine and unambiguous" records — such as arrestees' fingerprints and photographs — usually allow the reporter "[n]either motive [n]or opportunity to fabricate or falsify" them, thereby justifying their admissibility under a hearsay exception.[39]

In contrast, investigative reports prepared by a participant or observer to the incident being investigated raise concerns about the reporter's "motivations to misrepresent."[40] A reporter involved in the incident may wish to hide evidence of her own mistakes or misconduct or inflate evidence more likely to lead to her desired outcome. Such reports may take on an "adversarial nature," in which the reporter targets

---

[36] (...continued)
Rule 803(8)(B)." (quoting *United States v. Horned Eagle*, 214 F. Supp. 2d 1040, 1042 (D.S.D. 2002))); *Bermen*, 798 S.W.2d at 12 ("We are of the view that there is no point in having Texas rule 803(8)(B) if it can be bypassed by resort to Texas rule 803(6).").

[37] *Huggins*, 659 P.2d at 616.

[38] *Id.* at 615-16 (holding breathalyzer packet admissible under Evidence Rule 803(8)); *see also* Alaska R. Evid. 803(8) cmt. (noting that the breathalyzer certification found admissible in *Wester v. State*, 528 P.2d 1179 (Alaska 1974), would be admissible as a business record under Evidence Rule 803(6)).

[39] *United States v. Weiland*, 420 F.3d 1062, 1075 (9th Cir. 2005) (applying the public records exception).

[40] Alaska R. Evid. 803(6) cmt. (quoting *Hoffman v. Palmer*, 129 F.2d 976, 991 (2d Cir. 1942)).

an individual and accuses him of misconduct.[41] This kind of report thus has an elevated risk of unreliability; it is possible that the reporter's biases about the accused have compromised the report's accuracy.[42] These reliability concerns are particularly acute when reports have been prepared in anticipation of litigation in a particular case, as "many of the normal checks upon the accuracy of business records are not operative" in such circumstances.[43]

---

[41] *See, e.g.*, *Weiland*, 420 F.3d at 1074-75 (" '[P]olice officers' reports of their contemporaneous observations of crime' . . . might be biased by the adversarial nature of the report." (quoting *United States v. Orozco*, 590 F.2d 789, 794 (9th Cir. 1979))); *Allstate Ins. Co. v. Clarke*, Nos. 248934, 249398, 2007 WL 2710821, *5 (Mich. App. 2007) ("Reports prepared by police officers or their affiliates are not admissible under . . . the business records exception[] or . . . the public records exception[] because they are adversarial investigatory reports prepared in anticipation of litigation and thus lack the requisite indicia of trustworthiness.").

[42] *See generally* 5 AM. JUR. 2D *Trials* § 807 (2017) (describing the various ways a witness's perception of an event may be distorted); *see also Bermen v. State*, 798 S.W.2d 8, 11 (Tex. App. 1990) (indicating that "the subjective features of reports made in a[n] . . . adversarial setting" lack the inherent reliability of reports about "unambiguous factual matter" and therefore holding escape reports inadmissible).

[43] 2 KENNETH S. BROUN ET AL., MCCORMICK ON EVIDENCE § 288 (7th ed. 2016); *see also Palmer v. Hoffman*, 318 U.S. 109, 114 (1943) (excluding accident reports from business records exception because unlike business records, "these reports are calculated for use essentially in the court, not in the business[; t]heir primary utility is in litigating, not in railroading"). *Compare Norris v. Gatts*, 738 P.2d 344, 351 (Alaska 1987) (finding reports "not untrustworthy or unreliable" because they "were not compiled in anticipation of litigation"), *and Smiley v. State*, 1998 WL 90897, at *4 (Alaska App. Mar. 4, 1998) (statements "made in anticipation of litigation . . . would normally be inadmissible because they lacked guarantees of trustworthiness"), *with Rockwell v. State*, 176 P.3d 14, 25 (Alaska App. 2008) (finding immigration card admissible under Evidence Rule 803(8) because it was prepared "in the course of normal governmental duties" and "was not prepared in anticipation of litigation").

Accordingly, "an ordinary police accident report" is not admissible because the officer's report may be "colored" by circumstances surrounding the investigation, including "opinions gathered from second-hand sources who have a stake in pending litigation."[44] And documents reporting on a prisoner's escape — at least according to a Texas appellate court — are inadmissible for similar reasons: "The objectionable statements contained in these documents were not merely made as a result of ministerial objective observations, but rather, had the features of statements made in an adversarial setting, since they resulted from the criminal investigation of the escape."[45]

### 3. The incident report presented to the grand jury

The Parkview incident report presented to the grand jury in this case lacks many of the hallmarks that make other business records so "unusual[ly] reliab[le]"[46] as to warrant admissibility under an exception to the hearsay rule. The report was prepared by someone who knew Wassillie and who therefore could have been, consciously or unconsciously, swayed by pre-existing opinions of him. And the reporter, Dulany, a Parkview staff member, was an active participant in an investigation that resulted in a determination that Wassillie had violated Parkview's rules on alcohol and then committed a criminal escape.

The report also may have been "colored" by "opinions gathered from [a] second-hand source[] who ha[d] a stake in pending litigation"[47] — inmate Lavin, who first reported Wassillie's escape to Dulany. According to the report, Dulany "approached [Lavin] about him wanting to fight someone"; Lavin told Dulany that

---

[44] *State v. Huggins*, 659 P.2d 613, 616 (Alaska App. 1982).

[45] *Bermen*, 798 S.W.2d at 12.

[46] Alaska R. Evid. 803(6) cmt.

[47] *Huggins*, 659 P.2d at 616.

Wassillie was the one who threw the vodka through the window "in an attempt to get [Lavin] in trouble" and that Wassillie had "just left through the front door." When Lavin described these events to Dulany, Lavin was not "under a duty of accuracy" or "acting routinely."[48] He may have had a motive to be untruthful in some or all of his statement, as he had been accused of scheming with Wassillie to bring alcohol into Parkview; he may also have had a motive to deflect attention away from himself, as the reason Dulany approached him was apparently Lavin's announced desire "to fight someone." Reliance on a source who is not under a "duty of accuracy" takes a business record outside the scope of the business records exception.[49]

It is also relevant to our analysis that the incident report accuses Wassillie of escape — a violation of 22 Alaska Administrative Code (AAC) 05.400(b)(3) and a felony.[50] Dulany evidently expected the conduct he reported to have punitive consequences. The form on which the incident report appears provides two boxes that allow the reporter to designate the "Course of Action" to be taken on the basis of the report, "Disciplinary" and "Information"; Dulany checked "Disciplinary." And not only are incident reports "a basis for returning [a furloughed inmate like Wassillie] to custody," as the probation officer testified at trial, they also must be sent to the DOC's

---

[48]     Alaska R. Evid. 803(6) cmt.

[49]     The Commentary to Alaska Evidence Rule 803(6) explains that in the context of "ordinary business records," all those who are "furnishing the information to be recorded . . . are acting routinely, under a duty of accuracy, with employer reliance on the result." But if one of the individuals supplying information "does not act in the regular course, an essential link is broken." *Id.*

[50]     *See* AS 11.56.310(a)(1)(B).

assistant superintendent and to the district attorney for possible criminal prosecution, as happened here.[51]

Overall, the incident report in its lack of assured neutrality resembles police reports, which are not admissible under any exceptions to the hearsay rule. The information contained in the report could foreseeably be used against a particular individual in a particular criminal case, and the report could be influenced by the reporter's incentives to misrepresent, including a "motive to attempt to affect the outcome in a particular case."[52] We conclude that the incident report cannot be accorded the presumption of accuracy that Evidence Rule 803(6) recognizes in business records, and we therefore reverse the court of appeals' holding that the report was admissible under the business records exception.

---

[51]   22 AAC 05.400(b)(3) (2017) (identifying evasion as major infraction); 22 AAC 05.410 (requiring written reports and referral of those reports to the assistant superintendent); 22 AAC 05.460(a) (requiring facility superintendent to notify the district attorney of any infraction that could amount to a felony); *see Layton City v. Peronek*, 803 P.2d 1294, 1297 (Utah App. 1990) (finding a jail incident report inadmissible because it "was made with the intent to submit it to the court for 'prosecution' of a probation violation").

[52]   *Huggins*, 659 P.2d at 616.

**B.      The Error In The Grand Jury Proceeding Requires Reversal.**

Because the incident report was inadmissible, and because it was the grand jury's only source for the facts essential to the escape charge, we next need to consider the effect this error in the grand jury proceedings has on the validity of Wassillie's subsequent conviction.  The State urges us to hold that if there was an error, "the later error-free trial rendered the earlier error harmless."

**1.      Grand jury indictment is a critical part of Alaska's constitutional framework.**

We begin by emphasizing the grand jury's importance as a preliminary step in felony prosecutions.  The Alaska Constitution provides that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a grand jury."[53]  We have repeatedly recognized the importance of this right, emphasizing that "an accused is entitled, under Alaska law, to a decision *by a grand jury* that there is probable cause to hold him for trial."[54]

Alaska's retention of the criminal grand jury followed spirited debate on the subject at the Constitutional Convention.  The Committee on the Preamble and the Bill of Rights introduced a proposal that would allow prosecutors to proceed in any case by either indictment or information; it read, in pertinent part, "No person shall be prosecuted criminally for [a] felony other than by indictment or information, which shall be concurrent remedies."[55]  Delegate Dorothy Awes, the committee's chair, described

---

[53]      Alaska Const. art. I, § 8.

[54]      *Michael v. State*, 805 P.2d 371, 374 (Alaska 1991) (emphasis in original).

[55]      2 Proceedings of the Alaska Constitutional Convention (PACC) 1281, 1286 (Jan. 5, 1956); 6 PACC App. V at 64 (Dec. 15, 1955).  The proposed provision was patterned after Missouri's.  *See* 2 PACC 1325 (Jan. 6, 1956) (statement of Delegate John
(continued...)

the "unanimous feeling of the Committee that the grand jury should be preserved for [the] purpose [of returning indictments],"[56] but her explanation cast the grand jury in a secondary role behind the more common practice of charging by information: "By retaining the grand jury and the indictment, if you should have a district attorney, say, who is bringing in too many informations and acting in a pre-emptory matter [sic], then the governor has the right to call the grand jury."[57]

The next day Delegate Edward Davis introduced an amendment reflecting what he understood to be prevailing Territorial practice.[58] The amendment eliminated the concept of "concurrent remedies" and required indictment by a grand jury in all felony cases unless the defendant waived it.[59] Delegate Davis explained:

> In my practice it appears to me that the grand jury serves a useful purpose. In some cases, not often it is true, but in some cases a person against whom criminal charges have been filed by the district attorney or by private parties[] is released by the grand jury as there does not appear to be sufficient cause to hold him for trial. *That of course is the purpose of the indictment*.[60]

---

[55]  (...continued)
Hellenthal). The Missouri Constitution, Article I, section 17, provides: "That no person shall be prosecuted criminally for felony or misdemeanor otherwise than by indictment or information, which shall be concurrent remedies . . . ."

[56]  2 PACC 1286.

[57]  *Id.* at 1281.

[58]  *Id.* at 1322-23 (statement of Delegate Edward Davis); *id.* at 1323 (statement of Delegate Seaborn Buckalew).

[59]  *Id.* at 1322 (statement of Chief Clerk).

[60]  *Id.* at 1322 (emphasis added).

Other delegates argued vigorously against retaining the criminal grand jury at all. They argued that it afforded no protection against a prosecutor who exercised complete control over the evidence presented;[61] that prosecutors' abuse of the information was very rare;[62] and that overzealous prosecutors could eventually be checked by petit juries or by grand juries specially appointed to investigate out-of-control prosecutions.[63] They argued that in Territorial practice grand juries met too seldom and left arrestees languishing in jail while awaiting the next session;[64] that grand juries were expensive, served no "useful purpose," and did "not afford any additional protection to the accused";[65] that most of the states had given up the institution except for the limited purpose of investigating local corruption;[66] and that retaining the grand jury merely

---

[61] *Id.* at 1325 (statement of Delegate Buckalew) ("It is a secret proceeding which is more or less geared and controlled by the prosecutor and most of the time it is something that is just sort of a rubber stamp deal, and actually I can't see that it affords an accused person much protection at all . . . ."); *id.* at 1336 (statement of Delegate Steve McCutcheon).

[62] *Id.* at 1334 (statement of Delegate Hellenthal).

[63] *Id.* at 1326 (statement of Delegate Buckalew) ("[The prosecutor] is not going to be rushing in there filing informations without merit because the first time he does and it is thrown out or the case does not go to the jury, he would stop that practice right quick, because it would be fresh in the public minds that he [filed] an information and two weeks later he was miserably defeated."); *id.* (Delegate Buckalew) ("I think the superior [court] judge would convene a grand jury, certainly if there was anything unusual going on in his district or any other district, and I think too that if the prosecutor got out of hand and was running like a brush fire, that the court would probably convene a grand jury and require him to indict everybody by grand jury.").

[64] *Id.* at 286 (statement of Delegate Warren Taylor).

[65] *Id.* at 1323, 1325 (statement of Delegate Buckalew).

[66] *Id.* at 1323 (statement of Delegate Buckalew); *id.* at 1324 (statement of
(continued...)

because it was a "historical tradition dating from the time of the drawing of the Federal Constitution" would run counter to the Convention's attempts "to formulate a modern document."[67]

Delegate Davis responded by conceding that grand juries could be expensive, that the concept "is something historic," and that grand jury "proceedings are under the control of the district attorney."[68] But at the same time, he observed, "there isn't any question [but] that each grand jury that sits returns some 'no true bills'." He continued:

> The present grand jury [that] just finished sitting in Anchorage has returned probably 10 "no true bills". For those who are not lawyers, a "no true bill" means that somebody has been charged with a crime by the district attorney[,] and the district attorney, with all the control of the proceedings before the grand jury, has presented all of his evidence to the grand jury and in spite of that the grand jury has said that there is no cause to hold this man for trial, and the man has been released without going through a trial to a regular jury. Certainly under those circumstances it can't be said that the grand jury serves no useful purpose. It serves a distinctly useful purpose, and not[,] as Mr. Hellenthal said, only to persons evilly disposed. It might be me, it might be you, it might be anybody that was charged with [a] crime and was not guilty of that crime and should be released by a

---

[66] (...continued)
Delegate Taylor).

[67] *Id.* at 1324 (statement of Delegate Taylor); *id.* at 1325 (statement of Delegate Hellenthal) (arguing that "to require indictment in felonies is archaic, it is not modern, and I think it serves very little[,] if any, useful purpose").

[68] *Id.* at 1327.

-21-                                                    **7222**

grand jury when the evidence was produced before the grand jury.[69]

Acknowledging that the then-current grand jury schedule meant that most defendants would waive indictment, Delegate Davis concluded, "I certainly hope that we preserve the right to have the criminal matters investigated by a grand jury if the accused wants it done that way."[70]

Other delegates echoed Delegate Davis's faith in the grand jury as a check on the government's decision to prosecute. Delegate Ralph Rivers agreed that grand juries "serve a useful purpose."[71] He explained, "Sometimes, as Mr. Davis said, the grand jury will bring in a 'no true bill' meaning they just refused to accuse anybody because the evidence is too flimsy . . . ."[72] Delegate Yule Kilcher agreed: "I think that the grand jury essentially is an added protection to the citizens."[73] Delegate M.R. Marston related the "case of an Arctic friend of mine who came afoul of the law and landed in the jail," but the grand jury brought a no true bill "and he is a free citizen. . . . On that basis I am going to vote for Mr. Davis's amendment and preserve that grand jury."[74] Delegate Robert McNealy noted that "at least four of us here . . . have been United States attorneys and have handled the matters before the grand juries and are

---

[69]    *Id.*

[70]    *Id.*

[71]    *Id.* at 1323.

[72]    *Id.* at 1323-24.

[73]    *Id.* at 1324.

[74]    *Id.* at 1330.

conversant with them."[75] Stressing the importance of "this grand jury situation," he first acknowledged that if a prosecutor "really wants an indictment, in I would say 99 out of 100 cases he could secure [it]."[76] But he then focused his comments on the rare case: "[O]ccasionally our appointed prosecutors become a little overzealous and want to secure a number of convictions and in some of those instances a grand jury will return a no true bill."[77] He described "four or five instances" in which "more or less prominent citizens of the town" were subject to criminal investigation; the grand jury, however, refused to indict, and because the grand jury proceedings were secret there was no harm done "to the reputation of these few people where it was not warranted."[78] Delegate Mildred Hermann seconded that view, explaining that in her "20 years experience as an attorney in the courts of Alaska" she had "seen the misplaced zeal of some of our district attorneys"; she said, "I have from personal experience found that the grand jury protects the public, not the criminal nor the alleged criminal, but the public as a whole," and for that reason she supported the Davis amendment.[79]

> Delegate Davis had the last word on his proposed amendment. He said:
>
> I am interested in the occasional person who is charged with crime and who is completely innocent of that crime, and so far as I am concerned if even one person is charged with crime, who is innocent, and who may have the matter disposed of without having to stand trial, it's worth the cost, and it seems to be apparent here from everything that has

---

[75]     *Id.* at 1331.

[76]     *Id.*

[77]     *Id.*

[78]     *Id.*

[79]     *Id.* at 1334-35.

been said that, in spite of the fact the district attorney controls the grand jury, in spite of the fact that he presents evidence that would not be received in a court at law, in spite of the fact that the grand jury hears only one side of the thing, the grand jury occasionally, and we might say even frequently, finds there is not cause to hold a man for trial who has been charged by the district attorney. That ought to be sufficient to show that the grand jury serves a distinct useful purpose, not for those evilly disposed but for you and for me and for all of us.[80]

Alaska's constitutional framers went on, of course, to adopt the Davis amendment as Article I, section 8 of the Constitution.

The focus of the framers' discussion on "no true bills" reflects the importance of the grand jury's traditional filtering function. "Rubber stamp" and "ham sandwich" metaphors notwithstanding,[81] the requirement that felony charges be initiated by grand jury indictment "ensures that a group of citizens will make an independent determination about the probability of the accused's guilt 'before the accused suffers any of the grave inconveniences which are apt to ensue upon the return of a felony indictment.' "[82] As we explained in *Cameron v. State*, the grand jury acts "as both a

---

[80]     *Id.* at 1336-37.

[81]     *See id.* at 1325 (statement of Delegate Buckalew) ("[The grand jury] is more or less geared and controlled by the prosecutor and most of the time it is something that is just sort of a rubber stamp deal . . . ."); *Cameron v. State*, 171 P.3d 1154, 1157 (Alaska 2007) ("[A]ttention to the grand jury's protective role helps prevent the grand jury from becoming a mere 'rubber stamp' for the prosecutor."); *id.* at 1157 n.23 (noting the comment of New York Court of Appeals Chief Judge Sol Wachtler that the district attorney has enough influence over a grand jury to convince it to "indict a ham sandwich" (citing Editorial, *Do We Need Grand Juries?*, N.Y. TIMES, Feb. 18, 1985, at A16)).

[82]     *Cameron*, 171 P.3d at 1156 (quoting *State v. Gieffels*, 554 P.2d 460, 465 (continued...)

shield and sword of justice."[83]  As a shield, it "plays a protective role 'by operat[ing] to control abuses by the government and protect[ing] the interests of the accused.' "[84] While it "protects against the danger that a defendant will be required to defend against a charge for which there is no probable cause to believe him guilty,"[85] it also "serv[es] the invaluable function in our society of standing between the accuser and the accused . . . to determine whether a charge is founded upon reason or dictated by an intimidating power or by malice and personal ill will."[86]

We need not decide in this case whether the grand jury has the discretion to refuse to indict when the only reasonable view of the evidence supports the charges as framed by the prosecution.[87]  It is sufficient for purposes of today's analysis for us to

---

[82]       (...continued) (Alaska 1976)).

[83]       *Id.* (citing *Preston v. State*, 615 P.2d 594, 602 (Alaska 1980)).

[84]       *Id.* (alterations in original) (quoting *Preston*, 615 P.2d at 602).

[85]       *United States v. Mechanik*, 475 U.S. 66, 70 (1986).

[86]       *Id.* at 74 (O'Connor, J., concurring in the judgment) (quoting *Wood v. Georgia*, 370 U.S. 375, 390 (1962)).

[87]       *See State v. Markgraf*, 913 P.2d 487, 487 (Alaska 1996) (Mem.) (Matthews, J., dissenting) ("[W]hile a petit jury conviction eliminates any question as to whether probable cause existed, it does not preclude the possibility that an untainted grand jury, as a discretionary matter, might have indicted for a lesser offense, or not indicted at all.").

The court of appeals recently found "nothing in the language of [the first sentence of article I, section 8 of the Alaska Constitution], and nothing in the discussions of the Alaska Constitution pertaining to this sentence, to suggest that the purpose of this language was to create or acknowledge a grand jury right of 'nullification' — a right to refuse to indict someone for any reason the grand jurors might see fit"; however, the court declined to decide "to [what] extent . . . grand juries in Alaska have a power of

(continued...)

highlight the grand jury's critical role in what the framers created as a constitutional criminal process. Indictment is not just a step in this process; it is a foundation stone. Accordingly, we have "consistently held that courts should not hesitate to reverse a conviction when a substantial flaw in the underlying indictment is found, regardless of the strength of the evidence against the accused or the fairness of the trial leading to the conviction."[88]

### 2. Wassillie's indictment based on inadmissible hearsay was invalid.

Alaska's atypically strict evidentiary standards for grand jury proceedings reflect the constitutional framers' concerns about prosecutors' control over what the grand jury hears. The State's presentation of evidence to the grand jury is generally limited to that "which would be legally admissible at trial,"[89] although "[i]n appropriate

---

[87] (...continued) nullification." *State v. Leighton*, 336 P.3d 713, 715 (Alaska App. 2014). *Compare* Alaska R. Crim. P. 6(q) (providing that a grand jury "shall find an indictment" if presented with sufficient evidence to convict), *with* AS 12.40.050 (providing that a grand jury "may indict" upon sufficient evidence). *See also People v. Sullivan*, 503 N.E.2d 74, 77 (N.Y. 1986) (explaining that the grand jury's "power to extend lenity" includes "the extreme choices of complete absolution or indictment on the top count supported by legally sufficient evidence" as well as "returning a true bill for only a lesser offense"); *People v. Lin*, 647 N.Y.S.2d 411, 414 (N.Y. Sup. 1996) ("[A] grand jury 'may' indict if the applicable standards have been met; therefore, the grand jury may, without violating its duty, 'extend lenity' to the defendant by not indicting the defendant for a charge that is supported by the evidence." (quoting *Sullivan*, 503 N.E.2d at 77)).

[88] *Atchak v. State*, 640 P.2d 135, 151 (Alaska App. 1981) (citing *Keith v. State*, 612 P.2d 977, 980-81 (Alaska 1980); *Adams v. State*, 598 P.2d 503, 510 (Alaska 1979)).

[89] Alaska R. Crim. P. 6(r)(1). The federal courts and many state courts do not share this requirement. 4 WAYNE LAFAVE ET AL., CRIMINAL PROCEDURE § 15.2(d) (4th (continued...)

cases, witnesses may be presented to summarize admissible evidence if the admissible evidence will be available at trial."[90]  Alaska Rule of Criminal Procedure 6(r)(1) addresses hearsay specifically, instructing that "hearsay evidence shall not be presented to the grand jury absent compelling justification for its introduction" unless the hearsay falls into one of three enumerated exceptions.[91]  An indictment based upon inadmissible evidence is considered invalid;[92] but if sufficient admissible evidence was presented to the grand jury for it to indict, then the presentation of inadmissible evidence is harmless error.[93]

Having decided that the incident report was inadmissible hearsay — and absent any argument that there was a "compelling justification for its introduction" in

---

[89]     (...continued)
ed. 2016).

[90]     Alaska R. Crim. P. 6(r)(1).

[91]     *Id.*  Those exceptions are for statements by child victims of sexual assault; statements made by peace officers to other peace officers during the course of an investigation if otherwise corroborated; and evidence of prior convictions when relevant to prosecutions for driving while intoxicated.  *See* Alaska R. Crim. P. 6(r)(2), (3), (6).

[92]     *Adams*, 598 P.2d at 509; *Taggard v. State*, 500 P.2d 238, 243-44 (Alaska 1972), *disapproved of on other grounds by McCracken v. Corey*, 612 P.2d 990, 992, n.6 (Alaska 1980); *see also* AS 12.40.100(c) (stating that valid indictment is one that complies with requirements of this statutory provision and rules promulgated by Alaska Supreme Court); *State v. Skan*, 511 P.2d 1296 (Alaska 1973) (affirming dismissal of indictment before trial when indictment was based on hearsay evidence).

[93]     *E.g.*, *Frink v. State*, 597 P.2d 154, 161, 163 (Alaska 1979); *Metler v. State*, 581 P.2d 669, 672 (Alaska 1978).  This is because "[t]he general rule in Alaska is that events, occurrences, or happenings before the grand jury will not invalidate a subsequent indictment unless they contributed in some way to the return of that indictment." *Soper v. State*, 731 P.2d 587, 591 (Alaska App. 1987) (citing *Frink*, 597 P.2d at 161; *Hohman v. State*, 669 P.2d 1316, 1319-20 (Alaska App. 1983)).

lieu of live testimony[94] — we must conclude that it was error to present the report to the grand jury.[95] And the grand jury's decision to indict on an escape charge clearly depended on the hearsay evidence in both the incident report and Graber's testimony, as the evidence contained no other description of the relevant facts.[96]

We turn to the issue of how to remedy the error in the grand jury proceeding now that the defendant has been convicted by a petit jury in an apparently error-free trial. We addressed this question in *Adams v. State*[97] and *Taggard v. State*,[98] holding that an indictment based on inadmissible hearsay was invalid and that a conviction based on an invalid indictment must be reversed.[99] The State asks us to overturn this precedent, relying primarily on *United States v. Mechanik*, in which the United States Supreme Court held that under federal law an error-free trial renders

---

[94] The State candidly acknowledges that "in Wassillie's case, the prosecutor did not utilize this ['compelling justification'] exception" and that "there is no evidence as to why the prosecutor presented the incident reports in lieu of in-person testimony."

[95] Alaska R. Crim. P. 6(r)(1).

[96] There may be an argument that the "Absence Report" was an admissible business record, as it is largely a checklist of Parkview staff's routine responses to Wassillie's reported absence. But lacking any description of what the staff was reacting to other than a reported absence, the Absence Report gave the grand jury no basis for distinguishing between escape (the crime charged) and the usually less serious crime of evasion. Generally, a person commits "escape" by "remov[ing] oneself from official detention" by various means, *see* AS 11.56.300–.330, whereas a person commits "evasion" by "fail[ing] to return to official detention" when required to do so, *see* AS 11.56.335–.340.

[97] 598 P.2d 503 (Alaska 1979).

[98] 500 P.2d 238 (Alaska 1972).

[99] *Adams*, 598 P.2d at 509-10; *Taggard*, 500 P.2d at 243-44.

harmless a rule violation in the grand jury proceedings.[100] But we decline to overturn our contrary precedent for the reasons that follow.

### 3. *Taggard* and *Adams* require reversal of convictions following indictments based on inadmissible hearsay.

In *Taggard* we first addressed how to remedy an indictment based on hearsay evidence when the other admissible evidence presented to the grand jury was insufficient to support its decision to indict.[101] In that case a police officer testified before a grand jury about incriminating information he learned from an informant, but no evidence was offered that would enable the grand jury to evaluate the informant's reliability.[102] We held "that the hearsay evidence presented to the grand jury . . . lacks sufficient reliability to support the indictment."[103] This defect in the indictment was "substantial" and "of the substance and not mere form."[104] We therefore held that dismissal of the indictment was the appropriate remedy "even after a conviction"; "[t]he conviction must be overturned when an indictment is invalid and the error was properly preserved by a timely objection prior to trial."[105] We explained that "[t]he indictment is the foundation underlying a criminal prosecution. If the indictment is seriously flawed,

---

[100] 475 U.S. 66, 72 (1986).

[101] 500 P.2d at 242-44. Some of the *Taggard* court's discussion about the admissibility of hearsay evidence at grand jury proceedings has been superseded by the adoption of Criminal Rule 6(r) concerning admissibility of evidence in grand jury proceedings.

[102] *Id.* at 243.

[103] *Id.*

[104] *Id.* at 243-44.

[105] *Id.* at 243. In contrast, "[a] mere formal defect does not require dismissal of an indictment after the guilt of the defendant has been established at a fair trial." *Id.*

the conviction cannot stand."[106]  This reflects the constitutional framers' view of the grand jury's constitutional significance.

Several years later we reaffirmed this conclusion in *Adams*.[107]  Adams was convicted of mayhem for engaging in a street brawl.[108]  On appeal we found that while the evidence at trial was sufficient to sustain his conviction,[109] the only evidence before the grand jury to support the injury element of the mayhem charge came from a police officer's testimony relating what hospital personnel had told him about the victim's injuries.[110]  "Because the [admissible] evidence standing alone would not justify a conviction, the grand jury did not have enough evidence before it to indict Adams of mayhem. Thus, the indictment was invalid."[111]  We concluded again that this defect required reversal:  "If we were to find that a trial could validate an otherwise invalid indictment, the right to indictment by a grand jury would become a nullity and the grand jury would cease to operate as a check upon the district attorney's power to initiate prosecution."[112]

Federal law has no clear analog to this Alaska rule.  But federal courts and our courts apply different rules to grand juries, including different evidentiary

---

[106]  *Id.*

[107]  598 P.2d 503, 507, 510 (Alaska 1979).

[108]  *Id.* at 505.

[109]  *Id.* at 510.

[110]  *Id.* at 508-09.

[111]  *Id.* at 509.

[112]  *Id.* at 510.

standards.[113]   And the State's reliance on *United States v. Mechanik*[114] is not apt, considering the error before us; the *Mechanik* rule arises out of an error that, although a violation of Federal Rule 6(d) (regarding who may be present during grand jury proceedings),[115] did not necessarily compromise the validity of the indictment[116] and was not challenged before trial.[117]   While the Court in *Mechanik* held that the grand jury rule violation was rendered harmless once the defendant was convicted by a petit jury,[118] it

---

[113]   *See* LAFAVE ET AL., *supra* note 89, § 15.2(d) ("In the federal system, and in a substantial majority of the states (including a substantial majority of the eighteen indictment states, the rules of evidence . . . simply do not apply to grand jury proceedings."); *id.* § 15.5(c) (noting that federal courts and a "substantial majority of the states" will not dismiss an indictment when the grand jury relied on evidence that would be inadmissible at trial).  *Compare* Fed. R. Crim. P. 6, *and Costello v. United States*, 350 U.S. 359 (1956) (hearsay permissible), *with* Alaska R. Crim. P. 6(q), (r) (requiring sufficient uncontradicted, competent evidence to indict).

[114]   475 U.S. 66 (1986).

[115]   Federal Criminal Rule 6(d) is similar to Alaska Criminal Rule 6(k).

[116]   The State asserts that the indictment in *Mechanik* was "presumed to be invalid.  Otherwise, there would have been no call to consider whether the error in the indictment process required reversal of the subsequent conviction."  But the *Mechanik* Court never describes the indictment as defective or invalid.  *See* 475 U.S. at 67-73.  It speaks instead of an "error *in the grand jury proceeding*" and concludes that the error did "not affect[] substantial rights."  *Id.* at 70-71 (emphasis added).  Errors in the grand jury proceeding need not necessarily invalidate an indictment, just as errors at trial need not necessarily invalidate a trial verdict.  *See Bank of Nova Scotia v. United States*, 487 U.S. 250, 263 (1988) (indictment valid despite prosecutorial misconduct because the misconduct did not have a substantial effect on grand jury's decision to indict); *Gieffels v. State,* 590 P.2d 55, 59 (Alaska 1979) (indictment valid despite use of inadmissible hearsay when other, admissible evidence was presented that justified the indictment).

[117]   *Mechanik*, 475 U.S. at 68-69, 71-72.

[118]   *Id.* at 67 ("[T]he petit jury's verdict of guilty beyond a reasonable doubt
(continued...)

also "express[ed] no opinion as to what remedy may be appropriate for a violation of [Criminal] Rule 6(d) that has affected the grand jury's charging decision and is brought to the attention of the trial court before the commencement of trial."[119] *Mechanik* can be thus distinguished from our own governing precedent and from the case now before us.

### 4. Stare decisis counsels against overturning our precedent.

A party asking us to overturn precedent "bears a heavy threshold burden of showing compelling reasons for reconsidering the prior ruling"; we "will overrule a prior decision only when clearly convinced [(1)] that the rule was originally erroneous or is no longer sound because of changed conditions, and [(2)] that more good than harm would result from a departure from precedent."[120] "The stare decisis doctrine rests on a solid bedrock of practicality: 'no judicial system could do society's work if it eyed each issue afresh in every case that raised it.' "[121]

### a. The "originally erroneous" requirement

A decision is "originally erroneous" if it "proves to be unworkable in practice" or the other party "would *clearly* have prevailed if [relevant issues the prior

---

[118] (...continued) demonstrate[d] *a fortiori* that there was probable cause to charge the defendants with the offenses for which they were convicted." ).

[119] *Id.* at 72.

[120] *Thomas v. Anchorage Equal Rights Comm'n*, 102 P.3d 937, 943 (Alaska 2004) (quoting *State, Commercial Fisheries Entry Comm'n v. Carlson*, 65 P.3d 851, 859 (Alaska 2003)).

[121] *Id.* (quoting *Pratt & Whitney Can., Inc. v. United Techs.*, 852 P.2d 1173, 1175 (Alaska 1993)).

court failed to address] had been fully considered."[122] The State "does not contend that the *Adams/Taggard* rule is 'unworkable in practice,' " but it does argue that the analysis in those cases "is seriously flawed."

The State first argues that reversal of a conviction following an error-free trial may result in "perceived injustice" by causing "such a sense of outrage and injustice among victims and the public that the legitimacy of criminal convictions and the effectiveness and integrity of the justice system may validly be called into question." Perceptions about the legitimacy of the criminal justice system are very important. But the potential for "perceived injustice" cannot outweigh the need for actual procedural justice in the individual case. The Alaska criminal justice system includes a constitutional right to indictment by grand jury, and Alaska's legislature and courts take that right seriously enough to impose standards on the evidence the grand jury may consider.[123] *Adams* held that protecting the legitimacy and integrity of the grand jury was a critical concern; it concluded that reversal was required because to hold otherwise would render the right to indictment by a grand jury "a nullity."[124] This reasoning was not originally erroneous.

The State also argues that *Adams* and *Taggard* — in emphasizing the grand jury's function "as a check upon the district attorney's power to initiate prosecution"[125] — erroneously "assume[d] that prosecutors will intentionally disregard Criminal Rule 6(r) and that trial courts will look the other way when they do." But "overzealous prosecutors," though perhaps a rarity, were a repeated concern of the constitutional

---

[122]    *Id.* (emphasis in original) (quoting *Pratt & Whitney*, 852 P.2d at 1176).

[123]    *See* Alaska R. Crim. P. 6(r).

[124]    598 P.2d 503, 510 (Alaska 1979).

[125]    *Id.*

framers, and that concern shaped our constitutional right to a grand jury indictment. And the fact that prosecutors adhere to the rules of evidence and criminal procedure in most cases does not obviate the need for a remedy in the unusual case. Though errors may be rare they do occur, and they do occasionally slip past trial courts; in *Adams, Taggard*, and this case, a trial court failed to dismiss an invalid indictment.[126] And the infrequency with which a grand jury error requires a post-conviction remedy does not negate the need for a remedy. The remedy should match the severity of the violation — it should realistically account for the fact that the indictment was invalid. As we observed in *Taggard*, "[t]he indictment is the foundation underlying a criminal prosecution."[127] Only by reversing a conviction based on an invalid indictment can we safeguard the grand jury's role as a check on overzealous prosecution.[128]

The State also suggests that in *Adams* and *Taggard* we mischaracterized the nature of the defect in an indictment based on inadmissible hearsay evidence. The State asks us to draw a line between jurisdictional defects in indictments (such as the failure to allege an essential element of the offense) — which the State concedes warrant reversal — and nonjurisdictional defects (such as the hearsay rule violation at issue here) — which the State argues are rendered harmless by an error-free trial. The errors in *Adams* and *Taggard*, according to the State, were not jurisdictional and thus, as here, did not merit reversal.

---

[126]  *Id.*; *Taggard v. State*, 500 P.2d 238 (Alaska 1972).

[127]  *Taggard*, 500 P.2d at 243.

[128]  *Cf.* SARA SUN BEALE, ET AL., GRAND JURY LAW & PRACTICE § 1:9 (2d ed. 2016) (describing proposals for federal grand jury reform premised on belief that prosecutorial abuses are common in federal system because of insufficient procedural checks).

But we are unpersuaded that we should draw the line, as the State suggests, between jurisdictional and nonjurisdictional errors. We draw the line instead between errors that have the effect of invalidating an indictment and those that do not. Indictments may be invalid because of a nonjurisdictional error if the error "contributed in some way to the return of th[e] indictment."[129] And an invalid indictment — whether the error that made it invalid was jurisdictional or nonjurisdictional — requires a remedy. None of the State's arguments against reversal as a remedy overcome the concern we expressed in *Adams* that affirming a conviction based on an invalid indictment would render the right to indictment by grand jury a "nullity."[130]

Nor do the State's arguments show that we were incorrect in *Taggard* to conclude that dismissal of an indictment subsequent to conviction need not result in injustice; after all, we said, defendants can be reindicted and retried "on a record not tainted with irregularity."[131] In *Taggard* we acknowledged the "unfortunate"

---

[129]    *Soper v. State*, 731 P.2d 587, 591 (Alaska App. 1987) (citing *Frink v. State*, 597 P.2d 154, 161 (Alaska 1979); *Hohman v. State*, 669 P.2d 1316, 1319-20 (Alaska App. 1983)); *see also United States v. Mechanik*, 475 U.S. 66, 78 (1986) (O'Connor, J., concurring in the judgment).

Again, we recognize that not all rule violations result in invalid indictments. For example, the admission of hearsay in violation of Criminal Rule 6(r) will not invalidate an indictment if the grand jury had sufficient admissible evidence to support its decision to indict. *Webb v. State*, 527 P.2d 35, 36 (Alaska 1974). And "an indictment will not be dismissed for a violation of Rule 6(k) [governing who may be present during grand jury proceedings] unless the defendant shows that the violation prejudiced the fairness of the grand jury proceedings." *Hurn v. State*, 872 P.2d 189, 193 (Alaska App. 1994) (citing *Soper*, 731 P.2d at 591-92; *Boggess v. State*, 783 P.2d 1173, 1176 (Alaska App. 1989)).

[130]    *Adams*, 598 P.2d at 510.

[131]    *Taggard*, 500 P.2d at 244 (quoting *United States v. Beltram*, 388 F.2d 449,
(continued...)

consequence "that, at this stage of the proceedings, after a conviction has been properly obtained on sufficient evidence, the indictment must be dismissed because of the . . . failure to present sufficient evidence to the Grand Jury."[132]  We held nevertheless that a valid conviction could not be obtained on an invalid indictment.[133]  Again, we are not convinced that this original conclusion was erroneous.

### b.  The "intervening changes" requirement

As an alternative to proving that the precedential decisions were erroneous when decided, the State could instead make a "clear and convincing showing that the decision is no longer sound because conditions have changed" — for instance, "if 'related principles of law have so far developed as to have left the old rule no more than a remnant of abandoned doctrine, [or] facts have so changed or come to be seen so differently, as to have robbed the old rule of significant application."[134]

The State contends that in *Taggard* our "sole rationale for requiring reversal of the conviction after an error-free trial was that other courts have done so," and it notes that "other courts now rarely overturn convictions after an evidentiary error in the indictment." However, we do not follow other courts blindly, but rather because we find

_____

[131]    (...continued) 453 (2d Cir. 1968) (Medina, J., dissenting)).

[132]    *Id.* at 243-44 (quoting *People v. Jackson*, 223 N.E.2d 790, 792 (N.Y. 1966)).

[133]    *Id.* at 244.

[134]    *Thomas v. Anchorage Equal Rights Comm'n*, 102 P.3d 937, 945 (alteration in original) (quoting *Pratt & Whitney Can., Inc. v. United Techs.*, 852 P.2d 1173, 1176 (Alaska 1993)).

their opinions persuasive "in light of precedent, reason, and policy."[135] The State "bears a heavy threshold burden"[136] to move us from our earlier considered position. The fact that other courts — applying different evidence rules to grand jury proceedings — have drawn different conclusions about whether evidentiary errors invalidate indictments or warrant reversal of convictions does not convince us that our existing framework is unsound.[137]

The State also argues that the criminal justice system's increased emphasis on victims' rights makes the *Adams/Taggard* rule outdated. But "[a] victim's right to a timely disposition of a criminal case is satisfied if the proceedings take place in a timely manner, even if an appellate court later concludes that the proceedings were flawed and must be repeated."[138] And the State does not show that the victim's interest in being spared a new trial outweighs the defendant's constitutional right to a valid indictment.

Finally, the State argues that dwindling government resources counsel against using reversal as the remedy for grand jury error. The State suggests that a more efficient and less costly remedy already exists in the form of interlocutory appeals from

---

[135]    *See Young v. State*, 374 P.3d 395, 404, 415-16 (Alaska 2016) (quoting *Brooks v. Horner*, 344 P.3d 294, 297 (Alaska 2015)).

[136]    *Thomas*, 102 P.3d at 943 (citing *State, Commercial Fisheries Entry Comm'n v. Carlson*, 65 P.3d 851, 859 (Alaska 2003)).

[137]    *Cf. Michael v. State*, 805 P.2d 371, 373-74 (Alaska 1991) (concluding that constructive amendment of an indictment was reversible error, even though "most states" apply a different rule, because of the Alaska constitutional guarantee of grand jury indictment).

[138]    *Cooper v. District Court*, 133 P.3d 692, 701 (Alaska App. 2006).

denials of motions to dismiss, and the dissent endorses that remedy as well.[139]  But the State does not show us that the *Adams/Taggard* rule has caused any significant burden over the decades it has been the law of Alaska.  Approximately five percent of felony defendants are convicted after trial,[140] and the percentage of those who raise timely, colorable objections to error in the grand jury proceedings is surely smaller still.  Once identified, the grand jury error results in dismissal of a conviction only if the superior court failed to recognize the error when it was raised, the case went to trial, and the defendant was convicted.[141]  It seems that very few cases are likely to require retrial because of a grand jury error.  The cost of this rare consequence, even in light of the State's newly dire finances, is not a "changed condition" that compels us to reconsider our long-standing precedent.

Because we are not "clearly convinced" of the first element required for overruling the *Adams/Taggard* rule — that the rule "was originally erroneous or is no longer sound because of changed conditions" — we decline to overrule it.  We therefore

---

[139]  Dissent at 43.

[140]  *See* ALASKA JUDICIAL COUNCIL, ALASKA FELONY SENTENCING PATTERNS: SELECTED FINDINGS 83 (2016), http://www.ajc.state.ak.us/sites/default/ files/reports/research/final_draft_alaska_sentencing_patterns_2012_-_2013.pdf (showing that 94% of convictions were by plea agreement); Antonia Moras, *The Felony Case Process in Alaska:  The Judicial Council Analysis*, ALASKA JUSTICE FORUM, Winter 2004, at 3, 4 (showing that of the 85% of felony defendants who are convicted, 4.7% are convicted at trial and the remaining 95.3% through plea agreements).

[141]  Superior courts can and do dismiss indictments before trial due to errors in grand jury proceedings.  *See State v. Skan*, 511 P.2d 1296, 1297 (Alaska 1973) (affirming dismissal of indictment because the grand jury relied on the uncorroborated hearsay statements of an alleged accomplice).

need not reach the second element, whether "more good than harm would result from a departure from precedent."[142]

## V.    CONCLUSION

We REVERSE the court of appeals' decision that the incident report was admissible under the business records exception.  Because the indictment of Wassillie was invalid, we REVERSE his conviction.

---

[142]    *Thomas*, 102 P.3d at 943 (quoting *Carlson*, 65 P.3d at 859).

BOLGER, Justice, with whom STOWERS, Chief Justice, joins, dissenting in part.

I agree with the court's conclusion about the grand jury error in this case. The incident report was probably not admissible as a business record. So the grand jury presentation was based on hearsay presented without compelling justification in violation of Alaska Criminal Rule 6(r).

But I disagree with the court's conclusion that Wassillie's conviction must be reversed. The prosecution presented the same basic evidence at trial through the live testimony of the Parkview staff members. The trial jury then determined that the evidence established beyond a reasonable doubt that Wassillie had committed the crime of second-degree escape. This factual determination "necessarily means that there [was] probable cause to believe" that Wassillie had committed that crime.[1] In other words, if the same evidence had been submitted to the grand jury, then the grand jury would have been required to return the same indictment.[2]

The court's opinion on this issue is inconsistent with the way we have treated other issues involving preliminary proceedings. Recently we addressed a case where the superior court ruled that even though the police had violated the defendant's *Miranda* rights, the prosecution could use the police interview if the defendant took the

---

[1]    *State v. Markgraf*, 913 P.2d 487, 487 (Alaska 1996) (Mem.) (Matthews, J., dissenting).

[2]    *See* Alaska R. Crim. P. 6(q) ("The grand jury shall find an indictment when all the evidence taken together, if unexplained or uncontradicted, would warrant a conviction of the defendant."); *see also State v. Leighton*, 336 P.3d 713, 715 (Alaska App. 2014) (noting nothing in the text of the Alaska Constitution or the minutes of the convention suggesting a right to grand jury nullification).

stand at trial.[3] But the defendant chose not to testify at trial.[4] We declined to review his claim that the superior court's ruling was incorrect, in part because he could not establish that the *Miranda* error had affected the trial court proceedings.[5] Similarly, in *McConnell v. State*, we stated that "[i]t is well-established that an illegal arrest or detention does not bar the state from prosecuting criminal conduct or void a subsequent conviction."[6]

Likewise, in a civil case, we generally decline to review on appeal an order that denies a defendant's motion for summary judgment on factual grounds, even when the defendant argues that there were no genuine factual issues for trial. The reason is that appellate review of such orders "serves no purpose after a case is tried and a trial record has been developed."[7] And in a close analogy, we have recognized that errors in a probable cause hearing are generally cured by an error-free trial on a petition to adjudicate a child in need of aid.[8] I believe that we should follow the logic of these cases and hold that an evidentiary error at the grand jury presentation can be cured if the defendant is convicted after an error-free trial.

---

[3]   *Wagner v. State,* 347 P.3d 109, 111 (Alaska 2015).

[4]   *Id*.

[5]   *Id*. at 114-16.

[6]   595 P.2d 147, 155 n.26 (Alaska 1979) (citing *Gerstein v. Pugh*, 420 U.S. 103, 119 (1975); *Ker v. Illinois*, 119 U.S. 436, 439 (1886)).

[7]   *Larson v. Benediktsson*, 152 P.3d 1159, 1166 (Alaska 2007) (citing *Johnson Int'l Co. v. Jackson Nat'l Life Ins. Co.*, 19 F.3d 431, 434 (8th Cir. 1994)).

[8]   *Alyssa B. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*,165 P.3d 605, 610 (Alaska 2007); *D.E.D. v. State*, 704 P.2d 774, 782 (Alaska 1985).

In declining this rule, the court's opinion relies on our prior opinions in *Taggard v. State*[9] and *Adams v. State*.[10] But I believe that both these decisions were incorrect at the time they were decided.[11]

In *Taggard*, we held that hearsay evidence presented to the grand jury lacked sufficient reliability to support the indictment.[12] We decided to reverse the defendant's conviction based on the recognition that other courts had done so when a defect in the indictment is substantial.[13] But the cases this court relied on for this proposition did not involve any defect in the *evidence* presented to the grand jury. The cases that the *Taggard* court relied on were based on fundamental defects in the *text* of the indictment or information — these charges failed to allege an essential element of the offense.[14] This type of defect implicates the defendant's right to notice of the charge, a right that undoubtedly has an impact on the trial proceedings.[15] The *Taggard* court

---

[9]  500 P.2d 238 (Alaska 1972).

[10]  598 P.2d 503 (Alaska 1979).

[11]  *See Kinegak v. State, Dep't of Corr*., 129 P.3d 887, 889-90 (Alaska 2006) ("A prior decision should be overruled only if the court is clearly convinced that the precedent is erroneous or no longer sound because of changed conditions, and that more good than harm would result from overturning the case." (citing *State v. Fremgen*, 914 P.2d 1244, 1245-46 (Alaska 1996))).

[12]  *Taggard*, 500 P.2d at 243.

[13]  *Id*. (citing *People v. Fain*, 173 N.E.2d 825 (Ill. App. 1961); *State v. Bridges*, 412 S.W.2d 455 (Mo. 1967); *State v. Nolan*, 418 S.W.2d 51 (Mo. 1967); *State v. Sossamon*, 130 S.E.2d 638 (N.C. 1963)).

[14]  *See Fain*, 173 N.E.2d at 825; *Bridges*, 412 S.W.2d at 457; *Nolan*, 418 S.W.2d at 55; *Sossamon*, 130 S.E.2d at 640.

[15]  *See, e.g., Alto v. State*, 565 P.2d 492, 495 (Alaska 1977) ("Nothing is more
(continued...)

mistakenly relied on these cases involving a pleading error to reverse an evidentiary error that easily could be corrected at trial.

In *Adams*, we concluded that if an error-free trial "could validate an otherwise invalid indictment, the right to indictment by a grand jury would become a nullity and the grand jury would cease to operate as a check upon the district attorney's power to initiate prosecution."[16] But this conclusion ignored the defendant's right to file a pretrial motion to dismiss an indictment based on the grand jury presentation, and the trial court's obligation to grant such a motion if the indictment is not properly supported.[17] If the trial court improperly denies such a motion, then the defendant is entitled to petition for review.[18] "Though interlocutory review is 'not a matter of right,' such review is particularly appropriate in a case such as this, involving constitutional issues that would otherwise evade review."[19] These pretrial remedies establish that the *Adams* court erred when it concluded that post-trial review was necessary to protect the right to a grand jury indictment.

---

[15]     (...continued)
fundamental to our system of justice than the requirement that the accused be informed of the charges against him.").

[16]     598 P.2d 503, 510 (Alaska 1979) (footnotes omitted).

[17]     *State v. Markgraf*, 913 P.2d 487, 487 (Alaska 1966) (Mem.) (Matthews, J., dissenting).

[18]     *See* Alaska R. App. P. 402(b)(1) (allowing interlocutory review when postponement "will result in injustice because of impairment of a legal right"); Alaska R. App. P. 402(b)(4) (allowing review when the issue "might otherwise evade review").

[19]     *Wagner v. State*, 347 P.3d 109, 115 (Alaska 2015) (quoting Alaska R. App. P. 402(b)).

Moreover, the circumstances have changed since we decided *Taggard* and *Adams*.[20] In *United States v. Mechanik*,[21] the United States Supreme Court addressed a similar issue. In that case two law enforcement agents were sworn together and questioned before the grand jury in tandem.[22] This procedure violated Federal Rule of Criminal Procedure 6(d), which generally allows only specified persons to be present, including "the witness under examination." But the Court concluded that the guilty verdict returned at trial rendered this grand jury error harmless beyond a reasonable doubt.[23]

The Court recognized that there was no way to restore a defendant to the position he would have been in if the indictment had been dismissed before the trial: "He will already have suffered whatever inconvenience, expense, and opprobrium that a proper indictment may have spared him."[24] And the Court recognized that "reversal of a conviction entails substantial social costs: it forces jurors, witnesses, courts, the prosecution, and the defendants to expend further time, energy, and other resources to repeat a trial that has already once taken place; victims may be asked to relive their disturbing experiences."[25] Balancing these interests, the Court concluded that "the societal costs of retrial after a jury verdict of guilty are far too substantial to justify

---

[20] *See Kinegak v. State, Dep't of Corr.*, 129 P.3d 887, 890 (Alaska 2006) (concluding that changes in federal case law were "changed conditions" that supported overruling a precedent).

[21] 475 U.S. 66 (1986).

[22] *Id*. at 67.

[23] *Id.* at 70.

[24] *Id*. at 71.

[25] *Id*. (citing *Morris v. Slappy*, 461 U.S. 1, 14 (1983)).

setting aside the verdict simply because of an error in the earlier grand jury proceedings."[26]

I believe that the rule adopted in *Mechanik* is much better than a rule that encourages the defendant to rely on post-trial review. This case is a good example. The error in the grand jury presentation was committed seven years ago, and the order denying Wassillie's motion to dismiss was entered more than six years ago. If Wassillie had an incentive to pursue a petition for review, then the error could have been corrected at that time, and both parties would have avoided the time, expense, and anxiety of an intervening jury trial. If the issue had been decided at that time, then the State would have had a reasonable chance to make a proper presentation to both the grand jury and the trial jury — a chance that is likely foreclosed by the passage of time. And if the State did not seek another indictment, then Wassillie could have avoided the six-year prison sentence that he has now likely completed. Thus both parties would have benefitted from a pretrial determination of this issue.

In my opinion, the better rule is to view this type of grand jury error as harmless if the defendant is convicted following an error-free trial. I would affirm the court of appeals on this basis.

---

[26] *Id.* at 73.